## PALMISANO, ET AL. *v.* BALTIMORE COUNTY WELFARE BOARD

[No. 420, September Term, 1966.]

*Decided February 23, 1968.*

The cause was argued before HAMMOND, C. J., BARNES, MC-WILLIAMS, FINAN and SINGLEY, JJ.

*Douglas N. Sharretts* and *Edward J. Angeletti,* with whom was *Louis Peregoff* on the brief, for appellants.

*Mrs. Jean G. Rogers, Assistant County Solicitor,* with whom were *R. Bruce Alderman, County Solicitor* and *Harris James George, Deputy County Solicitor,* on the brief, for appellee.

FINAN, J., delivered the opinion of the Court.

When an adoption proceeding lengthens into prolonged litigation, when such litigation finds its way to the appellate level, one may be sure that behind every legal move and counter move lies an abundance of bitterness and, perhaps, heartbreak. If, to this unfortunate circumstance, one adds a child born out of wedlock to teenage parents who successfully conceal the birth from their own families, who in desperation surrender the child for adoption to a public agency, only to subsequently have a

change of heart after the adoptive parents have taken the infant into their home and formed a tender affection for it, the tragedy of the case becomes all too apparent. It is no wonder that, under these conditions, the child may properly be characterized as a "physical football" of the welfare board. It must follow that the primary concern of this Court is the welfare of the child, rather than the feelings of the adults or near adults who are the *dramatis personae*.

Madonna Peggy Hale was born in the Spring of 1964, the illegitimate child of Donna Agatha Palmisano, then age seventeen, and Ralph Hale, age twenty. Both young parents were successful in concealing the pregnancy from their parents, respected members of the community. On the advice of an adult friend Donna turned her baby over to the Harford County Welfare Board, which in turn placed it in a foster home. Except for the period between January and October of 1965, when the child was with prospective adoptive parents who later separated, the infant has remained with the original foster parents, and they are now the adoptive parents.

In July of 1964, the parents of the infant spoke to Mrs. Parlett, a Baltimore County Welfare Board social worker, and on July 13 Donna signed a "Release of Parental Rights," and in early September the father signed his "Consent," thereby turning the baby over to the Baltimore County Welfare Board for adoption.

The primary objection to the entire set of adoption proceedings raised by appellants concerns the hearing on September 10, 1964. On that date the Baltimore County Welfare Board petitioned for guardianship with the right to consent to adoption of Madonna Peggy Hale. A show cause order signed by a clerk of the court was issued, and served upon the mother, who was not *sui juris*, on that same date by Mrs. Parlett, the social worker. Also on the 10th, the court appointed John B. Farrell, an attorney and a Baltimore County probation officer, to be the mother's (Donna Palmisano) guardian *ad litem*.

The record for the most part contains conflicting accounts of what transpired between Donna Palmisano and her guardian *ad litem*, however there is sufficient evidence from which certain conclusions may be drawn. It is apparent that Mr. Far-

rell spent no more than twenty to thirty minutes with Donna Palmisano, part of that time in the presence of Mrs. Parlett and Ralph Hale, the father. The guardian did not inform Donna that the object of the interview was to determine whether she had reason to show cause why the adoption should not be decreed, nor did he explain that a guardian for the baby would be appointed if she raised no objection by October 15. He did not tell her that the guardian would then possess the absolute right to consent to adoption and to change the child's name. He did not tell her that the consent she signed in July was a waiver of notice to her of any proceeding relative to the adoption of the child. He did, however, tell her that what she had signed had such a degree of finality to it that she could never again get back her child. His guardian's answer, also filed September 10, recited that he adequately informed Donna that once the decree was signed, it extinguished all rights of the natural mother, for all time. It also stated that he was assured by the mother that she was willing to sign a release identical to the July 13 release. The lower court was satisfied that the consequences of the proceedings, in fact, were made known to Donna, and that she understood them.

On October 20, 1964, the circuit court entered a decree giving the Baltimore County Welfare Board guardianship with the right to consent to adoption. On November 5, 1965, over a year later than the decree, the Board sent the consent to adoption to the Harford County Welfare Board. Four days later, the foster parents petitioned the Harford County Circuit Court for adoption of the infant, and the final adoption decree was issued by Judge Stewart Day on November 15, 1965.

Also in November of 1965, Donna Palmisano, the natural mother became increasingly desirous of getting her baby back, and so informed Mrs. Parlett. On November 5, the same date that the Baltimore County board sent its consent to adoption to the Harford County board, Mrs. Parlett notified the Harford County board of the natural mother's desire, and on November 12, after the foster parents had already filed their petition for adoption, the Baltimore County board asked the County Solicitor to obtain an extension of its legal guardianship, which petition was filed on November 17, 1965, two days after the final adoption decree.

The first indication that the October 20, 1964 decree might be questioned occurred on December 15, 1965 when counsel for the appellants (Ralph Hale, Donna Palmisano and her parents) filed an appearance. On January 6, 1966, the natural parents of Madonna Hale were married, possibly for the purpose of strengthening their position in this litigation, and on February 10, appellants formally filed their motion to strike the October 20, 1964 guardianship decree. After a hearing on the petition, held May 24, 1966, the lower court dismissed the appellants' motion to strike and it is from this dismissal that the appeal is taken.

The Maryland rules provide that a court shall have revisory power over an enrolled decree only in cases of fraud, mistake or irregularity. Md. Rule 625 a. The appellants here raise only the issue of irregularity, and it does not take an overly critical inspection of the outlined facts to see that the officials in charge of this adoption acted in a somewhat unorthodox manner. However, this does not necessarily indicate that they were neglectful of their responsibilities or failed to act in the best interests of both parents and child. After a most thorough review of the record, we are of the opinion that the court below did not err in refusing to reopen the October 20, 1964 guardianship decree.

Appellants allege, and appellee concedes, that during the period between the birth of Madonna and the guardianship hearing of September 10, Donna Palmisano was under emotional stress. She felt unable to confide in her parents because her mother, "an impossible woman who * * * cuts a wide swath socially, but makes everybody around her miserable," had apparently rejected Donna, and in fact blamed Donna for her mother's miscarriage of a baby boy. Both Ralph Hale and Mrs. Eldridge, a former family friend, described Donna's mother as an emotionally disturbed woman. In such a situation, Mrs. Parlett, the social worker, was under no obligation to inform Donna's parents, and to do so would, in fact, derogate from her duty to protect the interests of Donna and her baby.

The record shows, however, that both Mrs. Parlett and Mr. Farrell took pains to inform the natural parents that the adoption would irrevocably terminate their parenthood. Mrs. Parlett testified that it was her custom to thoroughly explain the

effect of the release of parental rights, and that she told Donna that the release was not final until the petition was filed in court and the show cause order expired.

> "Q. When you explained this Show Cause Order of September 10, 1964, did you tell Donna that this was an order for her to show cause why adoption should not be decreed? A. Yes. I have made it a firm rule to explain in detail to every minor mother that I am assigned to, and I always say to every one of them, you have this date on here up to this date on here to change your mind, to object to this going through the courts, either in person or by an attorney, and I explain it very fully because it is the law, and I'm sure that every minor mother has the right to know that. I make a strong point of that. I would testify that I told that without any doubt to every minor mother that I contact, and I remember explaining it to Donna."

Mr. Farrell testified that he stressed the finality of the decree, and also informed both parents that even if they later married, they would be unable to get the baby back. We think that the record supports the finding that Donna understood the finality of her actions, even without the guidance of her parents.

The Maryland adoption laws do not require the knowledge of the mother's natural guardians, and in fact indicate that the court may appoint a guardian to protect the mother. Prior to 1963, Code 1957 Art. 16 § 74 provided that the minority of a natural parent would not be a bar to such parent's consent to adoption. In 1963, the statute was amended to read:

> "Minority of a natural parent shall not place such parent under a disability in adoption or guardianship with the right to consent to adoption proceedings and such parent, if he has attained the age of eighteen (18) years, may give a valid consent to adoption or guardianship with the right to consent to adoption and/or join as a party in such proceedings and shall be considered sui juris and no adoption or guardianship with right to consent to adoption shall be invalidated because of the minority of a natural parent."

H. Emslie Parks, Esq., a lawyer and a member of the Advisory Committee on Adoption of the State Department of Welfare, who drafted the 1963 amendment, testified that the only purpose of the amendment was to reduce the age below which a guardian must be appointed from 21 to 18. It does not, as appellants would have us hold, disable a mother under 18 from giving her consent to an adoption.

Maryland Rule D 75 a governs the appointment of a guardian *ad litem* and states:

> "*a. Parents Under Disability—Guardian ad litem.*
>
> If a parent whose child is to be adopted, or for whom a guardian with the right of consent to adoption is to be appointed, is a person under disability, the court shall appoint a guardian *ad litem* for such parent after service of the show cause order as required by Rule D74 (Notice). The guardian *ad litem* shall be a member of the bar, or other responsible and disinterested person, who shall investigate the facts of the case and report his findings to the court in writing; *if such parent has consented to the proceeding,* it shall only be necessary for the guardian to investigate and report to the court whether such parent understands the legal effect of the proceeding and consents thereto." (Emphasis supplied).

The fact is that Donna signed a consent to adoption in July, and that on September 10, Mr. Farrell carefully informed Donna of the legal effect of that consent before submitting his answer, and, it appears to this Court, sufficiently complied with Rule D 75 a. It should also be noted that Donna did not testify at the May 24, 1966 hearing at which time the validity of her consent was challenged, although she had the opportunity to do so.

Appellants ascribe certain irregularities to the issuance of the show cause order: the fact that it was issued by a clerk of the court rather than the Judge himself; the fact that it was delivered by Mrs. Parlett, an interested party; the fact that it incorrectly used the term "adoption" rather than "guardianship with the right to consent to adoption"; the fact that a copy was not served on Donna's natural guardians, her parents.

To answer the last allegation, it appears that appellants have misunderstood the application of the rules of procedure relative to adoption. Rule D 74 c, governing the service of the show cause order, provides in part:

"An additional copy of the show cause order shall also be served, in the manner provided by Rule 119 (Service of Process—Person under Disability), where both parents are under disability or the mother of a child born out of wedlock is a person under disability *and their or her consent is not filed with the petition.* No copy of the petition shall be served or published." (Emphasis supplied.)

Any doubts as to the construction to be given this rule are dispelled by the Rules Committee's notes:

"The purpose of this Rule is to assure the protection of due process to the natural parent whose rights will be terminated by the proceeding and at the same time to give adopting parents and adopted child the protection of a binding decree. Thus service of the show cause order on the natural parent may not be waived by the parent. Where the natural parent of an infant has previously consented to termination of parental rights, however, there does not seem to be any need to inform the parents of such natural parent of the proceeding, even if the natural parent is a person under disability."

Furthermore, Judge Proctor was himself a member of the Rules Committee, and at the hearing below he related the policy behind the adoption rule:

"I know that when the adoption rules were being debated by the Rules Committee, we had a very extended discussion on this problem of notice, vel non, to the natural guardian of the natural mother, * * *. * * * it is my recollection of this debate that the conclusion was that as between notice to a parent or parents and keeping the matter secret because of the wishes of the

natural mother, that the majority of the committee, a rather large majority, was in favor of the latter; that the protective measures which the Court felt was essential was an insulation between the two, a guardian ad litem who would investigate the matter and who would advise the minor—after all, most of them were girls under twenty-one which we were considering at that time—who would advise them of their rights and to ascertain with a reasonable degree of certainty what her rights were and the consent was voluntary."

In response to the other alleged irregularities, we must conclude that none exist, and if any unlawful procedure was performed, appellants have not shown this Court where they have been prejudiced. It should be noted that Mrs. Parlett was an employee of the Baltimore County Welfare Board and not herself a party to the hearing. Maryland Rule 116 a 1 states that a party to a suit may not be appointed to serve process. However, the Court has never held an *employee* of a party to be under such a disability.

The appellants also label as an irregularity the fact that the October 20, 1964 decree of guardianship allegedly expired one year later, but that the petitions for extension of guardianship and for adoption were not submitted until November of 1965. Rule D 78 states:

"*a. Interlocutory Decree Unnecessary.*
The court may enter a final decree of guardianship with the right to consent to adoption without first having entered an interlocutory decree.
*b. Duration.*
If a petition for adoption has not been filed within one year from the entry of the decree of guardianship with the right to consent to adoption, the guardian shall file with the court a written explanation of the delay. At any time the court may terminate the guardianship by revoking the decree."

It can be seen that the rule does not provide for *automatic expiration* of a final guardianship decree, but merely requires an

explanation of why adoption has been delayed. We are of the opinion, however, that the resolution of this case does not require that an interpretation be given Rule D 78. We believe that appellants, who filed a motion to strike a final decree pursuant to Rule 625, are limited to exposing gross irregularities in the hearing which preceded the decree being challenged. It is beyond the scope of Rule 625 for them to allege irregularities in appellee's compliance with the decree. This is all the more true when we realize that appellee's failure to complete adoption and to file an explanation within one year does not work hardship on the appellants. We believe that Rule D 78 was designed to expedite placement of adoptive children by the Welfare Board or other guardian. Upon the issuance of the final decree on October 20, 1964, the parents of the child were no longer interested parties, and therefore lacked the standing to challenge the Welfare Board's procedures subsequent to the final decree.

This Court is well aware that its decision has permanently separated a child from her natural parents, who are now in a position to accept her as their own. It realizes that as time goes by, these young parents may be haunted by the realization that, just a few miles away, their daughter is growing up in another home with people she will look upon as her father and mother. However, to do otherwise, this Court would be dissolving the foundation underlying all adoptions, the need to surround the final decree with a high degree of certainty. Society looks upon adoption as a salutary and uplifting humane act. The general welfare of the State is enriched by its use. It provides countless foundlings with an opportunity for a normal childhood which otherwise they might not have. Anything which would undermine public confidence in adoption procedures must be viewed by the courts in the gravest light.

We deem it unfortunate that Judge Day by verbal order and Judge Dyer subsequently by written order, directed that the adoption proceedings in Harford County be unsealed for inspection by the natural parents and their attorneys, thus revealing the name and address of the adoptive parents. Adoption laws were formulated in anticipation of emotional controversy and were designed to avoid it, as much as possible, by safeguarding the rights of both the natural as well as the adoptive parents.

In this case, those safeguards were utilized insofar as the natural mother was concerned, as she knowingly and intelligently consented to the adoption. We affirm the order appealed from.

*Order affirmed, costs to be paid by the appellants.*