507 A.2d 1151
**L.F.M., et ux.**

v.

**DEPARTMENT OF SOCIAL SERVICES.**

**No. 877, Sept. Term, 1985.**

Court of Special Appeals of Maryland.

May 8, 1986.

137, 416 A.2d 265 (1980), *appeal dismissed,* 450 U.S. 990, 101 S.Ct. 1688, 68 L.Ed.2d 189 (1981).

Gerard P. Uehlinger (Lentz, Hooper, Jacobs & Blevins, P.A., on brief), Baltimore, for appellants.

John C. Eidleman, Baltimore, for amicus curiae Minor Children.

Nancy B. Shuger, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., on brief), Baltimore, for appellee, BCDSS.

Richard C. Burch and Mudd, Harrison & Burch, Towson, on brief, for appellees John & Mary Doe, Prospective Adoptive Parents.

Argued before BISHOP, ADKINS and WENNER, JJ.

WENNER, Judge.

Upon this appeal we are asked to decide whether, following a termination of parental rights and the placement of a

child into a confidential prospective adoptive home, the natural grandparents have standing to petition for visitation.

## Background

The children involved in this appeal are twin boys, who were born on May 1, 1983, to C.W. and her husband, G.W. In December of 1983, when they were seven months old, the children were removed from the home of their natural parents by appellee, Baltimore County Department of Social Services (BCDSS) following allegations of abuse and neglect. They were adjudicated by the Circuit Court for Baltimore County to be children in need of assistance and placed in a foster home. Their parents received counseling and visited the children while they were in foster care. In July of 1984, the parents asked BCDSS to place the children for adoption after C.W. admitted striking one of them. The parents had apparently come to the conclusion that they were overwhelmed and were unable to cope with the demands of rearing the children. Although C.W.'s sister had offered to adopt them, the parents felt that adoption into an unknown family would be best for the children. On July 26, 1984, BCDSS filed petitions, in the Circuit Court for Baltimore County, for guardianship with the right to consent to the adoption of the children. The petitions were consented to by both parents. On the following day, the court named BCDSS guardian of the children with the right to consent to their adoption, and both children were placed in the same prospective adoptive home shortly thereafter.

E.M. is the paternal grandmother of the children. She and her husband, L.F.M., are the appellants.[1] They claim to have developed a warm and loving attachment to the children through a series of visits with them which began at

---

1. L.F.M. is the children's step-grandfather and, as the appellees point out, is "obviously not a blood relative of the children." The fact that he is a step-grandfather rather than a biological grandfather does not affect our decision in this case.

their birth and continued through a part of the time when they were in foster care. On May 1, 1984, E.M. celebrated the children's first birthday with them at the home of their maternal grandmother. That was the last time that either of the appellants saw the children. Visitation was halted by the foster mother, who felt that visitation by both sets of grandparents had become "too much."

According to appellants, despite their repeated telephone calls to BCDSS regarding visitation, BCDSS did nothing to promote visitation between appellants and the children; nor did BCDSS inform them of the guardianship proceedings. E.M.'s son told her in late July or early August of 1984 that adoption proceedings were underway. Appellants' attorney contacted BCDSS and requested a meeting between BCDSS, the appellants, and the prospective adoptive parents to determine whether visitation with appellants would be in the children's best interests. In November of 1984, after BCDSS had rejected this proposal, appellants filed a petition in the Circuit Court for Baltimore County seeking visitation with the children. In their petition they alleged that under the grant of jurisdiction to the equity courts contained in Md.Code Ann., Fam. Law, § 1–201 (1984), the court was empowered to order grandparental visitation. BCDSS opposed the petition. It argued, *inter alia,* that appellants had no right to seek visitation with the children under the Maryland adoption statutes, Md.Code Ann., Fam. Law, §§ 5–301 et seq. (1984).

The prospective adoptive parents were granted leave to intervene using the names John and Mary Doe. They took the position that: the natural parents had voluntarily consented to the termination of their parental rights; BCDSS, the children's legal guardian with the right to consent to their adoption, had advised the Does that it would consent to their adoption of the children; the Does intended to file petitions for adoption in January of 1985; the Does wanted to maintain the confidentiality and anonymity of the adoptions; and that neither the Does nor BCDSS believed visita-

tion by the appellants was in the children's best interests.[2] Counsel was appointed by the court to represent the children. Counsel for the children did not object to a hearing on the issue of whether visitation would be in their best interests.[3]

In early January of 1985, C.W. wrote a letter to the court in which she stated that she and her husband felt that they had been manipulated into consenting to the adoption of their children, that they deeply regretted their decision, and that they wanted the children returned to them. Their letter was treated by the court as a petition to intervene and a motion to vacate the guardianship order. Appellants then filed a motion to vacate the guardianship order in which they alleged that the granting of the guardianship with the right to consent to adoption without adequate notice to them, had deprived them of a protected liberty interest without due process of law. More specifically, they asserted that the notice provision contained in Md.Code Ann., Fam. Law, § 5–322 (1984), was unconstitional in that it failed to require that notice of the guardianship proceedings be given to them. The Attorney General was permitted to intervene on behalf of the State of Maryland, pursuant to Md.Code Ann., Cts. & Jud.Proc. § 3–405(c) (1984), to defend the constitutionality of Family Law Article, § 5–322.

In March of 1984, a hearing was held by the court (Jacobson, J.). In a bifurcated proceeding, the court first heard testimony concerning the consent of the natural parents to the termination of their parental rights. After

---

**2.** John and Mary Doe filed a statement with this court in which they adopted the Brief and Appendix of Appellee Baltimore County Department of Social Services.

**3.** Counsel for the children did not appeal from the judgment of the lower court. In response to appellants' brief, counsel for the children filed a brief with this court entitled "Brief of Appellee Minor Children." Because the children argue that the court below erred in not taking testimony on the issue of visitation and urge a remand to the lower court for that purpose, they have incorrectly styled themselves as appellees. In fact their position is that of the appellants. We have treated their brief as one of an *amicus curiae.*

finding that the parents had given knowing, voluntary and informed consents, the court denied their motion to vacate the guardianship order.[4] The court then heard arguments from the remaining parties as to the propriety of appellants' motion. After considering those arguments, the court concluded that appellants lacked any constitutional or statutory basis upon which to seek visitation with the children, declined to hear testimony on the merits of appellants' petition, denied appellants' motion to vacate the guardianship order, and dismissed their petition for visitation. It is from that order that this appeal was taken.

### Issues Presented

The questions presented to us, as framed by the appellants, are:

1. Did the lower court err in dismissing appellants' petition because both before and after the lower court's decree which terminated parental rights, appellants were entitled to an opportunity to be heard as to visitation with their grandchildren;

2. Were the grandparents' rights under the Due Process clause of the United States Constitution and the Maryland Declaration of Rights violated by the termination of parental rights by judicial action on July 27, 1984, without any notice to the grandparents? If such was premised upon Md.Code Ann., Family Law, Section 5–322 (1984), was such statute unconstitutional; and

3. Alternatively, even if issues 1 and 2 are answered in the negative, is it in the best interest of appellants' grandchildren that all interested parties, including appellants, be heard on the merits of visitation and the permanent plan for the grandchildren?

---

4. The natural parents noted a timely appeal from the order denying their motion to vacate the guardianship order. In August of 1985, however, they voluntarily dismissed their appeal.

For reasons which we will later explain, our answer to the first two questions is no. As we do not believe that Maryland law provides a mechanism through which a court can hear the merits of a petition for visitation by "all interested persons, including [grandparents]" in a case involving the termination of parental rights followed by an adoption by strangers, we will also answer no to the third question.

### 1. and 2.

■ We view appellants' first two arguments as essentially the same. They contend that, as grandparents, they have a constitutionally protected right under the due process clause of the Fourteenth Amendment of the United States Constitution and Article 24 of the Maryland Declaration of Rights to visit their grandchildren; and that, therefore, they were entitled to notice and an opportunity to be heard before their grandchildren were placed under the guardianship of BCDSS with the right to consent to their adoption. They claim that Md.Code Ann., Fam. Law, § 5–322 (1984)[5] is unconstitutional because it fails to re-

---

**5.** That statute provides as follows:

§ 5–322. Notice.

(a) In general.—(1) Subject to paragraph (2) of this subsection, a petitioner shall give to each person whose consent is required notice of the filing of a petition for adoption or a petition for guardianship.

(2) A person whose consent is filed with the petition need not be given notice if the consent includes a waiver of the right to notice of the filing of the petition.

(3) The petitioner shall give notice by entry and service of a show cause order sent to the last known address that the petitioner has for each person.

(b) Waiver.—(1) Except in an independent adoption, if the court is satisfied by affidavit or testimony that the petitioner, after reasonable efforts in good faith, cannot learn the identity or location of a natural parent, the court may waive the requirement of notice to the natural parent.

(2) In an independent adoption, if the court is satisfied by affidavit or testimony that the petitioner, after reasonable efforts in good faith, cannot learn the identity or location of a natural parent, the court may not waive the requirement of notice to the natural parent, but the court shall:

quire that notice of state action be given to them, as grandparents who had been exercising their grandparental right of visitation. We disagree.

Appellants assert that "[a]bsent abuse or parental objection, the right to maintain a relationship of love with one's flesh and blood, whether the . . . love of a parent for a child or . . . grandparental love of a grandchild, is firmly recognized in Maryland law." Appellants cite no authority for this proposition, and we have found none. Indeed, implicit in that very statement is the recognition that the source of grandparental visitation is parental permission, and this had been the historical rule. At common law, grandparents had no legal right to visit or communicate with their grandchildren if to do so was forbidden by the parents. *See* 59 Am.Jur.2nd, *Parent and Child* § 92. While it appears that prior to the termination of their parental rights, C.W. and G.W. had not objected to visitation between the appellants and their children, once their parental rights had been terminated the parents were no longer in a position to grant "visitation rights" to the appellants.

We do not question the sincerity or the depth of the affection that appellants feel for their grandchildren. That affection, however, simply does not translate into a constitutionally protected liberty interest. It is true that "freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 639–40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974) (citations omitted). This "family life" liberty interest has been recognized most frequently within the context of husband-wife or parent-

---

(i) order notice by publication; or

(ii) if the court finds the petitioner to be indigent, order notice by posting.

(c) Failure to respond.—If a person is notified under this section and fails to intervene within the time stated in the show cause order, the court shall consider the requirement of consent by that person to the adoption or to the guardianship to be waived.

child relationships. *E.g., Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Armstrong v. Manzo,* 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1962); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed.2d 1070 (1925). In some cases the "family life" interest has been recognized in relationships other than those of husband-wife or parent-child. *See, e.g., Moore v. East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (a grandmother and two grandsons); *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (an aunt and her niece). The United States Supreme Court, in a decision regarding the rights of foster parents, has suggested that foster parents may have a limited constitutional "liberty" interest in the foster family. *Smith v. Offer,* 431 U.S. 816, 843–46, 97 S.Ct. 2094, 2109–10, 53 L.Ed.2d 14 (1977). In each of the cases we have examined, however, which extended the "family life" liberty interest beyond the marital or parent-child relationship, the petitioning party had had, at some point, either actual or legal custody of the child or children involved. Appellants in this case have never had, or sought, custody of their grandchildren. They seek only to continue visitation with them and we have found no authority to suggest that the visitation appellants enjoyed prior to May 1, 1984, was a constitutionally protected liberty interest.[6]

---

**6.** It would seem that at the very core of the "family life" liberty interest is the right of a parent to control and direct the upbringing of a child, including the right of an individual to choose whether or not to become a parent in the first place. *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). This is true when the parent is a minor and under the authority of his or her own parents. Thus, in *City of Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) the United States Supreme Court ruled that state and parental interests in regard to the decision of a minor child to have an abortion must give way to the constitutional rights of a mature minor or an immature minor whose best interests would not be served by parental involvement. A state choosing to encourage parental involvement in the abortion decision

Because appellants lack a constitutionally protected liberty interest in visitation with their grandchildren, we hold that Family Law § 5–322 is not unconstitutional in that it failed to require that notice of the pending guardianship proceeding be given to them.[7]

*3.*

Appellants argue alternatively that, under Maryland statutory law, the court was empowered to award them visitation if it determined that to do so would be in the children's best interests. As authority for this proposition they point to the broad language of Md.Code Ann., Fam. Law,

---

of a minor must, therefore, provide for an alternative procedure through which a minor may demonstrate that she is mature enough to make her own decisions, or that the abortion is in her best interests, without notification to her parents. We note in this case that both parents are adults. There is evidence in the record that relationships between the parents and appellants are not good. It would seem to us from our reading of the "family life" cases that the liberty interest protected here was the right of the parents to determine, along with BCDSS, what would be best for the children, without the interference of appellants.

7. Appellants cite numerous cases from outside this jurisdiction to support their constitutional claim. These cases, however, all involve specific statutory schemes created by the various state legislatures. The case most closely analogous to the case *sub judice*, is *Brown v. Meekins*, 278 Ark. 67, 643 S.W.2d 553 (1982) in which the Supreme Court of Arkansas held that grandparents with court-ordered visitation rights were entitled to notice of the adoption of their grandchild. Those visitations had been initially granted, however, pursuant to Ark.Stat.Ann. § 57–135 (Supp.1981), which provided that following the death of a parent, grandparents could petition for visitation with the child of the deceased parent. In *Brown* the natural mother had died. A dispute arose between the natural mother's parents and the surviving father over visitation, and, pursuant to the state statute, the grandparents sought and obtained court-ordered visitation. When the father remarried, the step-mother petitioned to adopt the child and the adoption decree was granted without notice to the grandparents. The Supreme Court of Arkansas remanded the case to the lower court so that the grandparents would have an opportunity to be heard. As we see it, the crucial difference between this case and *Brown* is that in *Brown* the grandparents had been deprived of a right granted them by the courts pursuant to statutory authority. In this case appellants do not have an equivalent right.

§ 1–201, which defines the jurisdiction of equity courts and which specifically provides that "[a]n equity court has jurisdiction over . . . visitation of a child." As additional authority they cite former Md.Code Ann., Cts. & Jud.Proc. § 3–602(4) (1984), which provides in pertinent part:

At any time following the termination of a marriage, the court may consider a petition for reasonable visitation by one or more of the grandparents of a natural or adopted child of the parties whose marriage has been terminated, and may grant such visitation if the court believes it to be in the best interests of the child[.] [8]

This statute was originally enacted by Ch. 276, Laws of 1981. Both this court and the Court of Appeals have recently had occasion to examine the history and the legislative intent of this enactment. In *Skeens v. Paterno,* 60 Md.App. 48, 480 A.2d 820, *cert. denied,* 301 Md. 639, 484 A.2d 274 (1984), the lower court had awarded liberal visitation to the father of a child born out-of-wedlock, and provided in the decree that while the father was overseas on Navy duty his parents could exercise his right to visit with the child. The child's mother and her parents appealed. They argued that the grandparental visitation awarded in the decree was not permitted by Maryland law. They took the position that Section 3–602 limited court authorized grandparental visitation to situations in which a marriage had been terminated. After reviewing the history of Ch. 276, Laws of 1981, we affirmed the judgment of the lower court. Judge Adkins, writing for this court, held that Section 3–602 did no more than restate existing law as to grandparental visitation in the context of the termination of a marriage; it did not limit the power of a court to grant custody and visitation to grandparents under other circumstances. *Id.* at 61, 480 A.2d 820. We said further that:

It may well be . . . that custody shall be granted to a grandparent (as against a parent) only under exceptional

---

8. This statute is found in its present form in Md.Code Ann., Family Law Section 9–102 (1984).

circumstances. That may also be true as to grandparental visitation ... But here [the father's] absence on naval duty constituted such a circumstance. While he was away, an important way for him to maintain contact with the child—and for the child to maintain contact with the paternal side of his family—was through [the father's] parents.

*Id.* (citations omitted). In other words, although the paternal grandparents would surely develop their own relationship with their grandchild, the "rights" that they were exercising were those of their son, the child's father, to maintain contact with his child.

In *Evans v. Evans,* 302 Md. 334, 488 A.2d 157 (1985), the Court of Appeals held that language of Section 3–602 did not limit the class of individuals entitled to seek visitation rights to only biological parents, adoptive parents and grandparents. In *Evans,* as part of a divorce proceeding, the trial court had awarded visitation to a non-adoptive stepmother who had lived with and cared for the child for over five and one-half years, beginning when the child was eighteen months old. On appeal, this court, in an unreported opinion, vacated that part of the decree which granted visitation to the child's stepmother. The Court of Appeals reversed. It held that the trial court was empowered to grant visitation to other categories of persons than grandparents, parents or adoptive parents, and remanded the case to this court to review the trial court's determination that visitation with the stepmother would be in the best interest of the child.

In the case *sub judice,* however, we do not believe that the grandparental visitation statute and the cases decided under it can be read apart from the Maryland Adoption statutes.[9] Statutes which grant visitation to grandparents

---

9. We note that Maryland's "grandparents visitation" statute was transferred from the Courts and Judicial Proceedings Article of the Code to the Family Law Article, where it was placed under Title 9—Child Custody and Visitation, by Ch. 529, Laws of 1984. The adoption

are of relatively recent vintage. *See generally,* Note, *Statutory Visitation Rights of Grandparents: One Step Closer to the Best Interest of the Child,* 26 Catholic U.L.Rev. 377 (1977). Adoption statutes are much older.

Adoption has been defined as the means by which the legal relationship of parent and child is created between those not related as such by nature. 2 Am.Jr.2d, Adoption § 1. Adoption was unknown to the common law and exists in the Anglo-American system of jurisprudence only by virtue of statute. *Winter v. Director of the Department of Welfare of Baltimore City,* 217 Md. 391, 143 A.2d 81, *cert. denied,* 358 U.S. 912, 79 S.Ct. 242, 3 L.Ed.2d 233 (1958). Maryland has provided a statutory scheme for adoption for almost a century, ever since the enactment of Ch. 244, Laws of 1892.[10] That statute was enacted with no statement of purpose, and appears to have been primarily concerned with the effect of adoptions on inheritance and distribution of estates. The 1892 Act did provide that "[t]he effect of [a] decree of adoption shall be to entitle the child so adopted to ... the same rights of protection, education and maintenance as if born to [the adopting parent] in lawful wedlock, and the natural parents of such child shall be freed from all legal obligations toward it...." The 1892 Act remained in effect without substantial change for more than 50 years. In 1945, a commission was appointed to study the Maryland adoption laws. In 1947, acting upon the recommendation of the commission, the General Assembly substantially revised and up-dated the adoption laws with the enactment of Ch. 599, Laws of 1947. *See generally,* Strahorn, *Changes Made by the New Adoption Law,* 10 Md.L.Rev. 20 (1949).

---

statutes were transferred from Article 16—Chancery to the Family Law Article and placed in Title 5—Children, by Ch. 296, Laws of 1984.

**10.** This Act became Section 62A through 62F of Article 16 of the Code of Public General Laws. As we have noted, Maryland's present adoption statutes are found at Md.Code Ann., Fam. Law, §§ 5–301, et seq. (1984).

.

The statute as enacted was almost identical to the statute proposed by the commission. *See, Report of the Commission to Study Revision of Adoption Laws of the State of Maryland,* Baltimore Daily Record, June 1, 1946.

Ch. 599, Laws of 1947, began with a statement of legislative policy which, for the first time, acknowledged the need for protection of the familial integrity of the adopting parents as well as the protection of the natural parents and of the child:

> The General Assembly declares its conviction that the policies and procedures for adoption are socially necessary and desirable, having as their purpose the three-fold protection of (1) the adoptive child, from unnecessary separation from his natural parents and from adoption by persons unfit to have such responsibility; (2) the natural parents, from hurried and abrupt decisions to give up the child; and (3) the adopting parents, by providing them information about the child and his background, and protecting them from subsequent disturbance of their relationships with the child by natural parents.

Other than minor changes in style, the statement of legislative intent preceding the adoption laws remains the same today. Md.Code Ann., Fam. Law, § 5–303 (1984).

With regard to the 1947 revision of the adoption statutes, the commission noted that:

> Provision is made for the passage of an interlocutory decree for a trial period, during which time the child is in the home of the adoptive parents and under the supervision of the court. It is expected that this will be the usual routine which courts will follow, unless for some good reason the investigating agency recommends that a trial period is unnecessary. During the trial period the child is to all intents and purposes regarded as the child of the adoptive parents and they have all of the obligations of natural parents ... The effect is to give the adoptive child in all respects the status of a child born in

lawful wedlock, except only that the decree may be revoked if adoptive parents and child do not adjust. *Report of the Commission, supra.*

Along with the statement of legislative policy and the provision for an interlocutory decree of adoption, there is a third provision in the 1947 Act that is of particular importance in this case. That is the provision which mandated that records and papers in adoption proceedings be sealed. Although no supporting testimony or research on this issue was included with the commission's report, we suspect that at a time when "illegitimacy" carried an enormous social stigma, there was a widespread consensus that, wherever possible, adoptions ought to be anonymous and confidential. The provision mandating sealed adoption records lends support to the policy of protecting adoptive parents from subsequent disturbance by natural relatives of their relationships with the child. *See Palmisano v. Baltimore County,* 249 Md. 94, 103, 238 A.2d 251, *cert. denied,* 393 U.S. 853, 89 S.Ct. 93, 21 L.Ed.2d 123 (1966). It seems to us that it would be unrealistic to say that the same type of societal consensus on sealed adoption records exists today. *See, e.g.,* Levin, *The Adoption Trilemma: The Adult Adoptee's Emerging Search for His Ancestral Indentity,* 8 U.Balt.L.Rev. 496 (1979). Nevertheless, in spite of many persuasive arguments and proposals for reform from those advocating various methods to open adoption records,[11] the

---

**11.** In the late 1970's another commission was appointed to study Maryland's adoption laws, under the chairmanship of Gordon S. Livingston, M.D. The commission limited its consideration to the issue of whether adoption records should remain inaccessible to adult adoptees. The commission included numerous adoptive parents, adoptees, and professionals in the field of adoption. The majority of the commission recommended that records be opened to adult adoptees (over the age of 21) in future adoptions. It was also proposed that records be opened in the case of existing adoptions through the use of an intermediary, to provide a natural parent who had been promised confidentiality under existing law with a veto power over any disclosure of his or her identity. The proposals of the commission were not enacted. See, Report of the Governor's Commission to Study the Adoption Laws, January 1980.

legislature has maintained the policy of sealed adoption records to protect the identity of the parties involved, as presently codified in Family Law, Section 5–329. We do not need to decide the merits of such a policy. We do note, however, that a change in the policy of sealed adoption records would have a profound impact upon the expectations and the choices made by both adopting parents and natural parents. Many would argue, quite forcefully, that such a change would be for the better. We feel, however, that this is an issue to be resolved by the legislature and not by the courts.

■ In many cases of adoption today, such as adoptions by step-parents or adoptions of older children and adults, confidential and anonymous adoptions are simply not a reality. In this case, given the age of these children and the fact that they were placed at the urging of the natural parents into the home of an unknown family (appellees John and Mary Doe), that family had every right to expect that, under Maryland law, their identities would not be disclosed to the blood relatives of the children. To grant appellants visitation with the children under such circumstances would be contrary to the purpose of confidential adoptions.

It is true that the Does do not have custody of the children under an interlocutory decree of adoption. The children are still under the legal guardianship with the right to consent to adoption of BCDSS. BCDSS has placed the children in the Doe home and informed the Does that it will consent to their adoption of the children, but, at present, the authority of BCDSS over the children is superior to that of the Does.[12]

The statutory provision for granting a guardianship with right to consent to adoption was first enacted as Ch. 622,

---

**12.** The trial court agreed to delay entry of the final decree of adoption for 30 days so that the parties might appeal while the children are still under guardianship. Thus a final decree of adoption will not be passed until the end of the appellate process.

Acts of 1955.[13] Since that time, the legal effect on the natural parents of an order granting a guardianship with the right to consent to adoption has been the same as that of an interlocutory decree of adoption—the order terminates all of the rights, duties and obligations of the natural parents. It is implicit in the guardianship statute that the "rights" of other persons which are solely derived from the natural parents, are also terminated upon the entry of an order granting a guardianship with the right to consent to adoption.

Although the guardianship statute does not specifically mention prospective adoptive parents, it would be inconsistent with the statement of legislative intent preceding the adoption statutes to view the prospective adoptive parents as the appellants would have us view them, that is, as "mere custodians." It is clear, from a reading of Family Law, § 5-311(c)(2), that the consent to adoption of a child's legal guardian may be revoked prior to a final decree of adoption. There is, however, nothing in Maryland's statutory scheme for adoption to suggest that, once a child's legal relationship to its prior family has been severed and the child has been placed in a home for adoption, that the relationship of the prospective adoptive parents of that child would remain subject, over their objection, to the intrusion of members of the child's natural family. Of course, there is nothing in Maryland's adoption laws to prevent parties to an adoption from agreeing to visitation rights, and that agreement may be confirmed and enforced by court order. *Weinshel v. Strople,* 56 Md.App. 252, 466 A.2d 1301 (1983). But it seems to us that the Does are in a "trial period" similar to that created by an interlocutory decree of adoption. Thus, unless "parent and child do not adjust," or BCDSS revokes its consent to the adoption of the children,

---

**13.** This statute, in its present form, is Md.Code Ann., Fam. Law, § 5–317 (1984).

or the trial court determines that adoption by the Does is not in the children's best interests, there are no grounds for judicial intrusion into the relationship which the Does have with the children. Furthermore, the Does have the same rights as natural parents to create and maintain the stability of their family, subject only to the supervision of BCDSS; they are under no obligation to meet with appellants or to agree that appellants may visit with the children. *See, Weinshel v. Strople, supra,* at 263, 466 A.2d 1301.

Although this is a case of first impression in Maryland, numerous other jurisdictions have had occasion to consider the question of the visitation rights of grandparents following some form of separation from their grandchildren. *See generally,* Annot. 90 A.L.R.3d 222. A close examination of the cases we have found which have held that grandparental visitation may be permissible in the context of adoption, reveals that they are closely tied to state statutory grants of grandparental visitation. *See e.g., Roquemore v. Roquemore,* 275 Cal.App.2d 912, 80 Cal.Rptr. 432 (1969); *Reeves v. Bailey,* 53 Cal.App.3d 1019, 126 Cal.Rptr. 51 (1975); *Mimkon v. Ford,* 66 N.J. 426, 332 A.2d 199 (1975); *Graziano v. Davis,* 50 Ohio App.2d 83, 4 O.O.3d 55, 361 N.E.2d 525 (1976). Furthermore, the cases we have reviewed all involved a disruption of family relationships caused by divorce or the death of a natural parent and subsequent adoption by step-parents or relatives.

To-date, forty nine states have enacted statutes which grant visitation rights to grandparents in certain circumstances.[14] Those statutes vary widely. Of those states that expressly authorize grandparental visitation in the context of adoption, the statutory grants of visitation are inapplicable in the case of non-stepparent adoption. We have found

---

14. For an excellent, in-depth survey of the present statutory status of these issues in all fifty states, *see* Zablotsky, To Grandmother's House We Go: Grandparent Visitation After Stepparent Adoption, 32 Wayne L.Rev. 1 (Fall 1985).

no state statute which authorizes a petition for grandparental visitation following the termination of natural parental rights and an adoption by strangers. Because the statutory provisions of all of the states are so varied, we are convinced that the legislature is the appropriate forum in which to decide the matters of family policy involved here.

■ We note that, although the effect of adoption is to terminate the rights of the natural parents, some legislatures have become increasingly responsive to the concept of grandparental visitation in the context of stepparent adoptions. *See* Note, *Statutory Visitation Rights of Grandparents: One Step Closer to the Best Interests of the Child, supra.* There are also strong and cogent arguments that, in *any* adoption proceeding, *any* person who has developed an affectional relationship with the child ought to have standing to petition for visitation, provided it is judicially determined to be in the child's best interests. Note, *Visitation After Adoption: In the Best Interest of the Child,* 59 N.Y.U.L.Rev. 633 (1984). There must be a point, however, where adoptive parents are presumed, like natural parents, to be acting in their children's best interests without having to prove it in a court of law. That point is not completely clear; but we hold that, under Maryland law, where the rights of the natural parents have been terminated and a child has been placed for confidential adoption, the courts of this state are not empowered to award visitation to the child's natural family over the objection of the guardian with the right to consent to adoption and the prospective adoptive parents. Thus, the lower court did not err in dismissing appellants' petition for visitation.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANTS.