921 A.2d 171

**Glen KOSHKO, et ux.**

v.

**John HAINING, et ux.**

**No. 35, Sept. Term, 2006.**

Court of Appeals of Maryland.

Jan. 12, 2007.

Reconsideration Denied March 9, 2007.

406

Peter T. McDowell, Towson, for petitioners.

Karen A. Wyle, Bloomington, IN, Wayne C. Griffin, Frederick, brief of The Coalition of the Restoration of Parents' Rights, for petitioners, amicus curiae.

Stephen J. Kleeman, Towson, for respondents.

Suzanne Sangree, Roscoe Jones, Jr., Francis D. Murnaghan, Jr., Stephen Ruckman, Baltimore, for Public Justice Center, L. Tracy Brown, Towson, for Women's Law Center of Maryland, Leigh Goodmark, Jane C. Murphy, for Univ. of Baltimore Family Law Clinic, David R. Rocah, Baltimore, for ACLU of Maryland, brief of the ACLU of Maryland, the Public Justice Center, the University of Baltimore School of Law Family Law Clinic, and the Women's Law Center of Maryland, amici curiae.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, GREENE and JOHN C. ELDRIDGE (retired, specially assigned), JJ.

Opinion by HARRELL, J.

This case requires us to consider a constitutional challenge to Maryland's grandparental visitation statute ("GVS"), Maryland Code (1984, 2004 Rep l. Vol.), Family Law Article § 9–102.[1] Specifically, we are asked to decide whether the GVS is unconstitutional, under substantive due process analysis, because it fails to recognize a rebuttable presumption accorded the propriety of a parent's determination of what is in his or her child's best interest with respect to visitation with a grandparent. We further shall consider whether substantive due process requires a threshold finding of either parental unfitness or exceptional circumstances counseling in favor of

---

1. Family Law § 9–102 reads:

 An equity court may:
 (1) consider a petition for reasonable visitation of a grandchild by a grandparent; and
 (2) if the court finds it to be in the best interests of the child, grant visitation rights to the grandparent.

grandparent visitation before a court ·may proceed to determine what is in a child's best interests.

## I. FACTS

The instant case involves a bitter familial conflict centered around Petitioners', Glen and Andrea Koshko's, opposition to visitation by their minor children (Kaelyn, Haley, and Aiden) with the children's maternal grandparents, Respondents, John and Maureen Haining. The origins of the discontent between the adults harkens back to events long passed. It may have began as early as when then-Andrea Haining was living with her parents in Middletown, New Jersey. At age eighteen, Andrea left her parents' home, assertedly to escape the rancor of her parents' persistent and occasionally violent feuding, and moved to Florida with her boyfriend, James Atkats. While in Florida, Andrea became pregnant with her first child, Kaelyn. Mr. Atkats deserted Andrea and his unborn child. The young mother-to-be returned to New Jersey to live with her parents again. Andrea gave birth to Kaelyn on 26 September 1994. For the first three years of Kaelyn's life, she was raised in the Hainings' residence. Under this arrangement, the Hainings were active participants in Kaelyn's upbringing.

During Andrea's stay with her parents, she met and began dating Glen Koshko. In September 1997, Andrea and Kaelyn moved out of the Hainings' house in order to live with Glen in the nearby town of Point Pleasant. Due to the proximity of the couple's residence to Middletown, however, Maureen Haining maintained a close relationship with Kaelyn and visited often. Eventually, Glen and Andrea became affianced and, contrary to the plans and wishes of the Hainings, eloped in 1998. In June 1999, the newlywed couple and child moved to Baltimore County in connection with Glen's employment. At the time of the move, Kaelyn was nearly five years old. The family remained in Baltimore County throughout the times relevant to this litigation. The couple's two other children, Haley and Aiden, were born in Maryland on 21 August 1999 and 19 December 2002, respectively.

Undeterred by the physical distance between them, the Koshkos and Hainings visited one another approximately once a month until the parties became estranged in October 2003. The Hainings, at the trial of the present case, adduced various items of evidence, including photographs, videos, and E–Z Pass [2] billings intended to corroborate this visitation regimen. Included in this evidence was a log compiled by the Hainings detailing the times and locations of the thirty-one visits that occurred between May 2001 and October 2003. The trial court also received testimony and documentary evidence of telephone calls, letters, and cards exchanged by the Hainings and the Koshko children, offered to illustrate the degree of closeness between the grandparents and grandchildren.

The familial dispute foreshadowed in this opinion erupted in October 2003, precipitated by the Hainings' vehement disapproval of Glen Koshko's approach to the deteriorating condition of his mother, who was then in the final stages of terminal cancer. The Hainings, particularly Maureen, felt that Glen was spending too much of his free time engaged in self-indulgent social activities, including a five-day trip to Glen's college homecoming in South Carolina, rather than visiting with his ailing mother. During a telephone conversation with Andrea the week after the homecoming trip, Maureen Haining proposed that the Koshkos travel to New Jersey so that Glen could visit his mother while the Hainings would look after the children. Andrea declined the invitation and indicated that Glen had a birthday party planned for that weekend. Maureen renewed her offer, observing that Glen's mother would not live much longer and that the Koshkos already had spent a long weekend recreating in South Carolina. Andrea related Maureen's comments to Glen and he joined the telephone call on an extension. He and Maureen had what can be described

---

**2.** For the unacquainted, E–Z Pass, though probably familiar to the inhabitants of the mid-Atlantic seaboard, is a commercial service that allows motorists to pay into an account from which certain roadway and bridge tolls are deducted when the motorist passes through the prescribed toll lanes equipped to receive the transmission sent from the motorist's E–Z Pass transmitter "tag".

charitably as an unkind exchange of sentiments, resulting in Glen's assertion that the Hainings would not be allowed to see their grandchildren again. John Haining, hearing from his wife what transpired, confirmed the details with Andrea and then left a message on Glen's cell phone voicemail threatening to assault him later that evening in Maryland.

Following this contretemps, the Hainings apparently attempted on several occasions to make amends, which were rebuffed or ignored by the Koshkos. The Koshkos also disregarded a letter from Andrea's sister, Tracey, relating to the children's proposed roles in her wedding planned for August 2004. The Koshkos remained largely incommunicado from their extended family on the Haining side for approximately four months until an attorney engaged by the Hainings wrote to Glen and Andrea on or about 27 February 2004, suggesting mediation. The Koshkos responded to the suggestion by offering an arrangement permitting one visit with the children and the possibility of future visits based upon logistical considerations. The Hainings refused. Instead, the Hainings, unsuccessfully, demanded that the Koshkos commit to a consistent visitation schedule.

The Hainings filed their grandparent visitation petition on 19 April 2004 in the Circuit Court for Baltimore County. Following many months of motions and discovery, the petition was considered on its merits during a two-day trial in the Circuit Court. Ruling from the bench, the trial judge addressed the evidence adduced over the course of the hearing, concluding that the Hainings had rebutted the presumption in favor of the parents' determination of what is in their child's best interests. *See Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (plurality). The trial court entered an order granting the Hainings' petition, finding that visitation was in the best interests of the grandchildren. In addition to establishing a rolling schedule of four-hour visits every 45 days and quarterly overnight visits, the trial court directed that the Koshkos and Hainings attend at least four joint, professional counseling sessions to discuss issues relating to the visitation and "how the parties will re-introduce the

Hainings back into the grandchildren's lives." The Koshkos unsuccessfully moved for a new trial and then appealed the judgment. The Court of Special Appeals affirmed the judgment of the Circuit Court. *Koshko v. Haining*, 168 Md.App. 556, 897 A.2d 866 (2006).

The Court of Special Appeals first addressed the Koshkos' contention that the Maryland GVS is facially unconstitutional in light of the *Troxel* decision.[3] The intermediate appellate court relied on the principle of constitutional avoidance and held that the GVS implicitly contains the presumption that parents act in the best interests of their children. *Koshko*, 168 Md.App. at 570–71, 897 A.2d at 874–75. Next, the Court of Special Appeals disagreed with Petitioners' argument that the GVS was unconstitutionally applied to them because the best interest standard was engaged without a threshold determination of parental unfitness or exceptional circumstances, suggested as necessary in custody cases by *McDermott v. Dougherty*, 385 Md. 320, 869 A.2d 751 (2005). The intermediate appellate court, relying on this Court's holding in *Fairbanks v. McCarter*, excused the need for such a threshold finding based on the lesser intrusion on parental rights occasioned by visitation decisions relative to custody decisions. *Koshko*, 168 Md.App. at 582, 897 A.2d at 882 (citing *Fairbanks*, 330 Md. 39, 48, 622 A.2d 121, 125–26 (1993)). The court distinguished *McDermott*, a third party custody case, from *Fairbanks*, a third party visitation case, and refused to venture the view that *McDermott* impliedly overruled *Fairbanks* with respect to the need for a threshold finding of parental unfitness or exceptional circumstances. *Koshko*, 168 Md.App. at 583–84, 897 A.2d at 882–83. Finally, our appellate colleagues turned to the argument that the trial court had applied incorrectly the presumption favoring the parents' decision, to the benefit of the grandparents. Primarily emphasizing the relationship between the Hainings and their grandchildren, particularly Kaelyn, and the feud between the Hainings and Koshkos, the Court of Special Appeals held that "there

---

3. *Troxel* will be discussed in greater detail, *infra* Section II.B.

was sufficient evidence to rebut the presumption." *Koshko,* 168 Md.App. at 586, 897 A.2d at 883. The court also characterized the trial court's questioning of Andrea Koshko concerning her reasons for terminating visits by the Hainings as "an obvious effort to give [the][p]arents a final opportunity to bolster the rebutted presumption for purposes of the weighing process on best interests," rather than the court applying a presumption to the benefit of the grandparents. *Koshko,* 168 Md.App. at 586, 897 A.2d at 884.

We issued a writ of certiorari, on the petition of the *Koshko v. Haining,* 393 Md. 245, 900 A.2d 751 (2006).[4]

## II. ANALYSIS

Before we engage the questions concerning the validity of the Maryland GVS, we note some relevant precedential guideposts framing the constitutional landscape and informing our analysis. We do so because the arguments raised by Petitioners and *amici* necessarily call into question the continuing soundness of certain of our precedents relative to the GVS. We shall note the relevant cases in chronological (oldest to most recent) and "evolutionary" order.

### A. Maryland Precedent Bearing on the GVS

#### *Fairbanks v. McCarter*

The first occasion had by the Court of Appeals to pass on the Maryland GVS was in 1993, some 12 years after the statute was enacted,[5] in *Fairbanks v. McCarter. Fairbanks*

---

4. Petitioners framed the following questions in their petition:

 1. Whether Md.Code Ann. Fam. Law Art. § 9–102 is constitutional under the Due Process Clause of the Fourteenth Amendment.

 2. Whether the lower court unconstitutionally applied Md.Code Ann. Fam. Law Art. § 9–102 in granting visitation of the minor children to grandpa[r]ents.

5. The original version of the GVS in Maryland, enacted in 1981, was amended in 1993. The provision in the original statute providing that grandparent visitation could only be considered upon the dissolution of

arose from a disagreement between a divorced father and maternal grandparents over the amount of time the maternal grandparents should be permitted to visit with the children. *Fairbanks,* 330 Md. at 43, 622 A.2d at 123. To settle the dispute, the aggrieved grandparents filed a petition under the GVS as it existed prior to 1993 (see n. 4 *supra). Id.* The trial court denied the petition because it found that the grandparents had not demonstrated exceptional circumstances militating that visitation should be ordered. *Fairbanks,* 330 Md. at 44, 622 A.2d at 124. Bypassing the Court of Special Appeals, the Court of Appeals considered whether such circumstances must be found before visitation could be ordered under the GVS. *Id.*

In response to the argument that the GVS should be construed to include a requirement that "only exceptional circumstances, present as conditions precedent, may justify an award of visitation to grandparents," the Court flatly stated that nothing in the plain language of the statute required such a predicate showing. *Fairbanks,* 330 Md. at 47–48, 622 A.2d at 125. In addition, the Court held that a threshold showing of parental unfitness is similarly unnecessary. *Id.* In so doing the Court disapproved of dicta in *Skeens v. Paterno,* 60 Md.App. 48, 480 A.2d 820 (1984), suggesting that exceptional circumstances were a prerequisite to grandparental visitation, as is the case of a custody determination. *Fairbanks,* 330 Md. at 47–48, 622 A.2d at 125 (citing *Skeens,* 60 Md.App. at 61, 480 A.2d at 826 ("It may well be, as we said in *Boothe[ v. Boothe,* 56 Md.App. 1, 466 A.2d 58 (1983) ] that custody should be granted to a grandparent (as against a parent) only under exceptional circumstances. That may also be true as to grandparental visitation.") (citation omitted)). Instead, the Court opined that "[v]isitation is a considerably less weighty matter than outright custody of a child, and does not demand the enhanced protections, embodied in the exceptional circum-

---

the marriage of the child's parents was eliminated in 1993. *Koshko v. Haining,* 168 Md.App. 556, 568–69, 897 A.2d 866, 873–74 (2006).

stances test, that attend custody awards." *Fairbanks,* 330 Md. at 48, 622 A.2d at 126.

The *Fairbanks* Court stated that the best interests of the child standard is dispositive, which should be resolved in the "sound discretion of the trial court." 330 Md. at 49, 622 A.2d at 126. The Court entrusted trial judges, whom it believed were best suited to evaluate the peculiarities of the individual cases they encounter, to evaluate "all relevant factors and circumstances pertaining to the grandchild's best interests," including a number of factors delineated by the Court.[6] *Fairbanks,* 330 Md. at 50, 622 A.2d at 126–27.

### Beckman v. Boggs

In *Beckman v. Boggs,* the Court of Appeals was asked to interpret the GVS in the context of a paternal grandparents' award of visitation challenged by maternal grandparents who, with the consent of the natural father, had adopted their grandchild after the child's mother died. 337 Md. 688, 690, 655 A.2d 901, 902 (1995). At issue was whether the adoption by the maternal grandparents terminated any visitation right to which the paternal grandparents laid claim. The Court upheld the trial court's grant of visitation as it did not abuse its "sound discretion" in evaluating the best interests of the child. *Beckman,* 337 Md. at 703, 655 A.2d at 908. The Court excused the trial court's failure to make findings as to all of the factors mentioned in *Fairbanks, see supra* n. 5, because those factors were not intended to be "absolute," but merely "illustrative of what should be considered." *Beckman,* 337

---

6. The *Fairbanks* Court proposed that its non-exhaustive list of factors include:

the nature and stability of the child's relationships with its parents; the nature and substantiality of the relationship between the child and the grandparent, taking into account frequency of contact, regularity of contact, and amount of time spent together; the potential benefits and detriments to the child in granting the visitation order; the effect, if any, grandparental visitation would have on the child's attachment to its nuclear family; the physical and emotional health of the adults involved; and the stability of the child's living and schooling arrangements.

330 Md. at 50, 622 A.2d at 126–27.

Md. at 703–04, 655 A.2d at 909. The *Beckman* Court echoed the conclusion reached in Fairbanks that the showing of exceptional circumstances is not a necessary prerequisite for grandparental visitation. 337 Md. at 692–93, 655 A.2d at 903.

## Maner v. Stephenson

One year after *Beckman,* the Court of Appeals was again confronted with a grandparent visitation dispute in *Maner v. Stephenson,* 342 Md. 461, 677 A.2d 560 (1996). *Maner* was the first GVS case to involve a petition concerning the children of an "intact nuclear family." [7] 342 Md. at 463, 677 A.2d at 560. *Fairbanks* dealt with a divorced father. *Beckman* involved a widowed father and adoptive maternal grandparents. The Court in *Maner* read the GVS to allow courts to grant grandparental visitation petitions regardless of whether the parents' marriage was intact. *Maner,* 342 Md. at 467–68, 677 A.2d at 563. It also reiterated the lessons of *Fairbanks:* namely, that exceptional circumstances are not required to be shown by petitioning grandparents and that a trial court should exercise its discretion in weighing a child's best interests according to the totality of the circumstances. *Maner,* 342 Md. at 468–70, 677 A.2d at 563–64. *Maner* was also the first grandparental visitation decision specifically to discuss any presumption as to a child's best interests: the Court expressly refused to bestow upon the grandparents a rebuttable presumption in favor of their visitation. 342 Md. at 470, 677 A.2d at 564.

## Wolinski v. Browneller

In 1997, the Court of Special Appeals decided *Wolinski v. Browneller,* involving a quarrel between a single mother and her boyfriend's parents over the visitation schedule to be used

---

7. The *Maner* Court referred to the Supreme Court's definition of "nuclear family" as "essentially a couple and their dependent children." *Maner v. Stephenson,* 342 Md. 461, 463 n. 1, 677 A.2d 560, 560 n. 1 (1996) (quoting *Moore v. City of East Cleveland,* 431 U.S. 494, 500, 97 S.Ct. 1932, 1936, 52 L.Ed.2d 531 (1977)). We surmise that the term "intact" is meant to indicate that the couple had not obtained a divorce.

in a mutually sought visitation order. 115 Md.App. 285, 291, 693 A.2d 30, 33. The intermediate appellate court restated many of the conclusions reached in *Fairbanks,* but with some additional argumentation and authority. The *Wolinski* court recapitulated that an award of visitation, though a form of "temporary custody," 115 Md.App. at 305, 693 A.2d at 39 (quoting *Beckman,* 337 Md. at 703 n. 7, 655 A.2d at 908 n. 7), is less intrusive upon the liberty interests of parents than adoption or custody awards. *Id.* (quoting *M.L.B. v. S.L.J.,* 519 U.S. 102, 127, 117 S.Ct. 555, 570, 136 L.Ed.2d 473 (1996) and *Fairbanks,* 330 Md. at 48, 622 A.2d at 126). Expanding upon that notion, the court reasoned that, as a matter of degree, a court's granting of a grandparent's visitation *schedule* (as opposed to the grant of visitation in the first instance) over that of the parent's preference was even less of an affront to the parent's constitutional rights. *Wolinski,* 115 Md.App. at 307, 693 A.2d at 40. Intertwined in this analysis was the proposition that grandparents need not show exceptional circumstances to prevail in their quest for visitation. *Wolinski,* 115 Md.App. at 306, 693 A.2d at 40. The *Wolinski* court also parroted the *Fairbanks* decision with respect to the discretion vested in the trial court and the best interests standard as the prevailing guide to decisions made in this context. *Wolinski,* 115 Md.App. at 319, 693 A.2d at 46.

The Court of Special Appeals in *Wolinski* did offer, however, some additional explication on the operation of the GVS. The court expressly found a constitutional presumption favoring parents' determination of what is in their child's best interests in the context of a grandparental visitation dispute. Facilitated by the decisional law of the U.S. Supreme Court and Maryland Court of Appeals recognizing this presumption in custody and adoption proceedings, the intermediate appellate court applied a somewhat less commanding presumption to the GVS. *Wolinski,* 115 Md.App. at 309–12, 693 A.2d at 42–43. Nonetheless, the court stated that the presumption favoring a parent's wishes regarding their child (in this case, concerning the visitation schedule) could be overcome by a trial court's contrary finding of visitation being in a child's

best interest, a determination which is entitled to deference upon judicial review. *Wolinski*, 115 Md.App. at 319, 693 A.2d at 46. The Court of Special Appeals opined that parents' rights are protected inasmuch as petitioning grandparents bear the burden to produce evidence discrediting a parent's wishes and a trial court cannot "[s]imply [ ] ignore a parent's wishes...." *Id.*

## Brice v. Brice

In July 2000, the Court of Special Appeals filed its opinion in *Brice v. Brice*, 133 Md.App. 302, 754 A.2d 1132, the first reported Maryland appellate opinion on the issue of grandparental visitation following the U.S. Supreme Court's decision in *Troxel*. In *Brice*, the intermediate appellate court, based upon a perceived factual similarity with *Troxel*, held that the Maryland GVS was unconstitutional as applied to a mother who neither was found to be unfit nor opposed to any visitation by the petitioning grandparents. 133 Md.App. at 309, 754 A.2d at 1136. *Brice* also noted *Wolinski's* conclusion regarding the slighter degree of parental rights infringement present in grandparental visitation schedule disputes. 133 Md.App. at 309–10, 754 A.2d at 1136.

## In re Tamara R.

Although not a grandparent visitation case, *In re Tamara R.*, 136 Md.App. 236, 764 A.2d 844 (2000), presents a third party visitation dispute relevant to our analysis here. *In re Tamara R.* involved a visitation dispute between a father and his minor daughter found to be a child in need of assistance (CINA), who was separated from her younger siblings still in the custody of their father. 136 Md.App. at 240–41, 764 A.2d at 846. The father objected to any visitation by his custodial children with the CINA sibling, citing his fundamental right to control the upbringing of his children outside of state interference. *In re Tamara R.*, 136 Md.App. at 241, 764 A.2d at 846. The Court of Special Appeals synthesized the holdings of *Fairbanks* and *Troxel*, yielding a conclusion that the *Fairbanks* factors concerning the best interest determination be

viewed through a lens deferring to a parent's wishes: "The best way to do this, we believe, is to apply a presumption that the parent's decision to decline visitation is in the best interest of the child over whom the parent has custody, and to place the burden on the non-parent seeking visitation to rebut that presumption." *In re Tamara R.*, 136 Md.App. at 252, 764 A.2d at 853.

### *Shurupoff v. Vockroth*

In a grandparent custody case, *Shurupoff v. Vockroth*, 372 Md. 639, 814 A.2d 543 (2003), the Court endeavored to clarify language from a seminal family law case, *Ross v. Hoffman*, 280 Md. 172, 372 A.2d 582 (1977), concerning the application of the best interest of the child standard. As will be discussed in our summary of the later decided *McDermott v. Dougherty*, *supra*, the Court ultimately was not successful in this attempt to bring some clarity to the muddied waters of our third party custody jurisprudence. The *Shurupoff* Court identified seemingly contradictory verbiage from *Ross* that described the best interests standard as "always determinative," but later qualified that

it is only upon a determination by an equity court that the parent is unfit or that there are exceptional circumstances which make custody in the parent detrimental to the best interest of the child, that the court need inquire into the best interest of the child in order to make a proper custodial disposition.

372 Md. at 661, 814 A.2d at 556–57 (quoting *Ross*, 280 Md. at 178–79, 372 A.2d at 587). *Shurupoff* attempted to reconcile this apparent contradiction by stating that what *Ross* really meant was that parental decisions are entitled to a rebuttable presumption as being in their child's best interests, which presumption may be rebutted, *inter alia*, by a showing that the relevant parent is, or the parents are, unfit or that exceptional circumstances exist. 372 Md. at 662, 814 A.2d at 557.

## Herrick v. Wain

In *Herrick v. Wain,* 154 Md.App. 222, 838 A.2d 1263 (2003), another grandparental visitation case, the Court of Special Appeals recited *Fairbanks's* pronouncement that exceptional circumstances are not required in order to award grandparental visitation, as well as the factors to be examined during the application of the best interest of the child standard. 154 Md.App. at 231–32, 838 A.2d at 1268. The *Herrick* court also quoted approvingly from *Wolinski* the proposition that petitioning grandparents bear the burden of producing evidence sufficient to satisfy the *Fairbanks* factors regarding rebuttal of the parental presumption. 154 Md.App. at 238, 838 A.2d at 1272.

## McDermott v. Dougherty

In *McDermott v. Dougherty,* 385 Md. 320, 869 A.2d 751 (2005), we again dealt with a grandparent custody case, as was the context in *Shurupoff.* As a foundation for our opinion in *McDermott,* we stated that fit parents stand in a position superior to third parties relative to the constitutional right to the "care, custody, and control" of their children. 385 Md. at 353, 869 A.2d at 770. We then recanted our earlier attempt in *Shurupoff* to explain the language in *Ross v. Hoffman* regarding the best interest of the child standard, holding instead that:

> generally, in private actions in which private third parties are attempting to gain custody of children of natural parents over the objection of the natural parents, it is necessary first to prove that the parent is unfit or that there are extraordinary circumstances posing serious detriment to the child, before the court may apply a "best interest" standard.

*McDermott,* 385 Md. at 374–75, 869 A.2d at 783. Thus, absent a showing of parental unfitness or exceptional circumstances, "the constitutional right [of parents to the 'care, custody, and control' of their children] is the ultimate determinative factor. . . ." *McDermott,* 385 Md. at 418, 869 A.2d at 808. Having determined that an examination of whether exceptional circumstances exist should precede the need for a best interests

analysis, we embraced the factors enumerated in *Ross v. Hoffman* for identifying exceptional circumstances. *McDermott*, 385 Md. at 419, 869 A.2d at 809.

## B. The U.S. Supreme Court's Decision in *Troxel v. Granville*

Although we decide the present case based principally on the ample Maryland authority catalogued above pertaining to grandparental custody and visitation, *Troxel* occupies a role of some importance insofar as it has influenced, to some degree, the Maryland cases that followed its filing.

*Troxel* resulted in a plurality opinion authored by Justice O'Connor, separate concurring opinions by Justices Souter and Thomas, and three individual dissenting opinions penned by Justices Stevens, Scalia, and Kennedy. The plurality opinion and the two concurrences concluded that a Washington State third party visitation statute violated the dictates of federal due process. *Troxel*, 530 U.S. at 68, 120 S.Ct. at 2061 (the plurality and Justice Thomas resting on an "as applied basis," with Justice Souter favoring facial invalidation).

The Washington statute read: " 'Any person may petition the court for visitation rights at any time including, but not limited to; custody proceedings. The court may order visitation rights for any person when visitation may serve the best interest of the child whether or not there has been any change of circumstances.' " *Troxel*, 530 U.S. at 61, 120 S.Ct. at 2057–58 (quoting Wash. Rev.Code § 26.10.160(3) (1994)). A trial court granted grandparental visitation with a single mother's children to her ex-boyfriend's parents. *Troxel*, 530 U.S. at 60, 120 S.Ct. at 2057. The Washington intermediate appellate court dismissed the paternal grandparents' visitation petition on the basis that they lacked proper standing. The grandparents appealed to the Washington Supreme Court. *Troxel*, 530 U.S. at 62, 120 S.Ct. at 2058. The Washington high court concluded that the grandparents had standing, but invalidated the visitation statute on its face as an affront to the mother's fundamental parental rights in two respects. *Troxel*, 530 U.S. at 63, 120 S.Ct. at 2058. First, the court found problematic

the lack of a threshold showing of harm validating the state's interference in the parent's affairs. *Id.* Second, because the statute permitted any person to maintain a visitation petition solely on the basis of a child's best interests, the state was invested with unfettered discretion to award visitation premised on a single judge's opinion of which was the superior arrangement for the child. *Troxel,* 530 U.S. at 63, 120 S.Ct. at 2058–59.

The Supreme Court plurality in *Troxel* affirmed the judgment of the Washington high court, but did so based upon a different rationale. At the outset, the plurality opinion observed that contained within the bounds of the federal Due Process Clause is a fundamental liberty interest bestowed upon parents concerning the "care, custody, and control" of their children. *Troxel,* 530 U.S. at 65–66, 120 S.Ct. at 2059–60. Of the three factors relied upon to support the Court's decision that the Washington statute infringed upon this right, the first was that there was no finding that the custodial parent was unfit. *Troxel,* 530 U.S. at 68, 120 S.Ct. at 2061. When the trial court engaged its analysis of whether the requested grandparental visitation was in the child's best interests, it failed to honor the "traditional presumption that a fit parent will act in the best interest of his or her child." *Troxel,* 530 U.S. at 69, 120 S.Ct. at 2062. The second factor cited by the plurality opinion was that the trial court erred in not assigning "some special weight" to the parent's estimation of her child's best interests. *Troxel,* 530 U.S. at 70, 120 S.Ct. at 2062. As the final factor, the Court noted that the custodial mother never desired to terminate visitation completely, but merely to reduce its frequency. *Troxel,* 530 U.S. at 71, 120 S.Ct. at 2062–63.

The four Justice plurality also commented that the trial court's ruling was based upon meager factual findings relating to the children's best interests, which improperly was determined under a presumption in favor of the grandparents. *Troxel,* 530 U.S. at 72, 120 S.Ct. at 2072. The Court then faced a variation on one of the issues now before us: although the resolution of a grandparental visitation petition cannot be

made upon the basis of a "simple disagreement between the [trial court] and [parent] concerning her children's best interests," the Court declined to decide whether the Due Process Clause requires all grandparental visitation statutes to mandate a threshold showing of harm to the children as a prerequisite to granting visitation. *Troxel*, 530 U.S. at 72–73, 120 S.Ct. at 2063–64. Indeed, the Court refused to strike down any state grandparental visitation statutes and acknowledged the various case-by-case approaches states take in ruling on visitation petitions, including Maryland's *Fairbanks* factors. *Troxel*, 530 U.S. at 73–74, 120 S.Ct. at 2064 (citing *Fairbanks*, 330 Md. at 49–50, 622 A.2d at 126–27).

The concurring opinions added little to the rationale contained in the plurality opinion. Justice Souter, however, hinted that parents enjoy a presumption that their decisions regarding their children's best interests are correct, in light of their underlying fundamental parental rights. *Troxel*, 530 U.S. at 79, 120 S.Ct. at 2067 (Souter, J., concurring) ("It would be anomalous, then, to subject a parent to any individual judge's choice of a child's associates from out of the general population merely because the judge might think himself more enlightened than the child's parent. To say the least . . . parental choice in such matters is not merely a default rule."). Language in Justice Thomas's concurrence also may be viewed as an endorsement of this presumption favoring fit parents' choices regarding their children. *Troxel*, 530 U.S. at 80, 120 S.Ct. at 2068 ("Here, the State of Washington lacks even a legitimate governmental interest-to say nothing of a compelling one-in second-guessing a fit parent's decision regarding visitation with third parties."). Further, Justice Thomas posited that the parental right at stake, due to its fundamental nature, would invoke strict scrutiny review under which the statute would be invalidated. *Id.*

### C. The Present Case

As the parents of Kaelyn, Haley, and Aiden, the Koshkos are invested with the fundamental right of parents generally to direct and control the upbringing of their chil-

dren; the pages of the United States and Maryland Reports corroborate this point. *In re Samone H.,* 385 Md. 282, 300, 869 A.2d 370, 380 (2005) (stating that "[a] parent's interest in raising a child is, no doubt, a fundamental right, recognized by the United States Supreme Court and this Court," and cataloguing cases); *In re Yve S.,* 373 Md. 551, 565–66, 819 A.2d 1030, 1038–39 (2003); *Boswell v. Boswell,* 352 Md. 204, 217–18, 721 A.2d 662, 668–69 (1998); *Sider v. Sider,* 334 Md. 512, 527 n. 12, 639 A.2d 1076, 1084 n. 12 (1994); *accord Troxel,* 530 U.S. at 65–66, 120 S.Ct. at 2060 (stating that "we have recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children," and cataloging cases); *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982); *Parham v. J.R.,* 442 U.S. 584, 602, 99 S.Ct. 2493, 2504, 61 L.Ed.2d 101 (1979); *Stanley v. Illinois,* 405 U.S. 645, 651–52, 92 S.Ct. 1208, 1213, 31 L.Ed.2d 551 (1972). This liberty interest provides the constitutional context which looms over any judicial rumination on the question of custody or visitation. *McDermott,* 385 Md. at 352–53, 869 A.2d at 770; *Wolinski,* 115 Md.App. at 302, 693 A.2d at 38. Grandparents, on the other hand, do not enjoy a constitutionally recognized liberty interest in visitation with their grandchildren. *L.F.M. v. Dep't of Social Servs.,* 67 Md.App. 379, 386–88, 507 A.2d 1151, 1154–55 (1986). Rather, whatever right they may have to such visitation is solely of statutory origin implemented through judicial order. Parents and grandparents, therefore, stand on unequal footing in disputes over visitation with minors. *See McDermott,* 385 Md. at 353, 869 A.2d at 770.

█ As a natural incident of possessing this fundamental liberty interest, the Koshkos are also entitled to the long-settled presumption that a parent's decision regarding the custody or visitation of his or her child with third parties is in the child's best interest. *McDermott,* 385 Md. at 423, 869 A.2d at 811; *Monroe v. Monroe,* 329 Md. 758, 781 n. 4, 621 A.2d 898, 909 n. 4 (1993) (quoting *Ross v. Pick,* 199 Md. 341, 351, 86 A.2d 463, 468 (1952) ("Where parents claim the custody of a child, there is a *prima facie* presumption that the child's

welfare will be best subserved in the care and custody of its parents rather than in the custody of others, and the burden is then cast upon the parties opposing them to show the contrary.")); *Ross v. Hoffman,* 280 Md. at 177–78, 372 A.2d at 586–87; *DeGrange v. Kline,* 254 Md. 240, 242–43, 254 A.2d 353, 354 (1969); *accord Troxel,* 530 U.S. at 69, 120 S.Ct. at 2062. This presumption is premised on the notion that "the affection of a parent for a child is as strong and potent as any that springs from human relations and leads to desire and efforts to care properly for and raise the child, which are greater than another would be likely to display." *Melton v. Connolly,* 219 Md. 184, 188, 148 A.2d 387, 389 (1959). The Koshkos here protest that their parental rights and the attendant presumption favoring parental decisions relating to their children's best interests are disregarded both by the express terms of § 9–102 of the Family Law Article, as well as its application by the trial court in the present grandparental visitation dispute.

### 1. Facial Validity of the Maryland GVS

The Maryland GVS simply provides that grandparents may petition for "reasonable visitation" and empowers equity courts to grant such petitions if grandparental visitation is "in the best interests of the child." Family Law § 9–102. Attacking the facial constitutionality of the GVS, the Koshkos argue that the statute contravenes *Troxel's* interpretation of the due process safeguards that must accompany a grandparental visitation statute. The Koshkos point to *Troxel's* condemnation of the Washington State GVS for its lack of any express acknowledgment of the parental presumption or assignment of "special weight" to parents' estimations of their children's best interests. 530 U.S. at 67, 120 S.Ct. at 2061 ("[The Washington statute] contains no requirement that a court afford the parent's decision any presumption of validity or any weight whatsoever. Instead, [it] places the best-interest determination solely in the hands of the judge.").[8]

---

8. In a different context, we, too, have observed that the best interest standard, by itself, may be inadequate to protect constitutional liberties.

This, however, is an incomplete extraction of *Troxel's* holding on the point. Petitioners overlook the plurality's observation that the Washington Supreme Court refused to apply a judicial gloss to the Washington statute so as to engraft a parental presumption in order to remedy the statute's otherwise "breathtakingly broad" provisions. *Id.* ("The Washington Supreme Court had the opportunity to give § 26.10.160(3) a narrower reading, but it declined to do so."). The *Troxel* Court, for that reason, was bound by the strictures of federalism to abide by the Washington Supreme Court's interpretation of the scope of its state statute. *See Wisconsin v. Mitchell,* 508 U.S. 476, 483–84, 113 S.Ct. 2194, 2198–99, 124 L.Ed.2d 436 (1993) ("There is no doubt that we are bound by a state court's construction of a state statute."). We shall take a different tack than our Washington colleagues.

■ As the Court of Special Appeals noted, the Maryland GVS fairly and easily may be supplemented by judicial interpretation with an inferred presumption that parental decisions regarding their children are valid.[9] *Koshko,* 168 Md.App. at 570–71, 897 A.2d at 874–75. This superimposition of the parental presumption onto the GVS is permitted by the so-called "canon of constitutional avoidance",[10] which provides that "a statute will be construed so as to avoid a conflict with the Constitution whenever that course is reasonably possible."

*See Mack v. Mack,* 329 Md. 188, 221–22, 618 A.2d 744, 760–61 (1993) (holding that, in determinations of whether to terminate such life support, a best interests standard alone would not adequately protect the lives of those in persistent vegetative states whose wishes regarding the termination of hydration and ventilation is unknown).

**9.** Indeed, the Court of Special Appeals, nine years prior, read the presumption into the GVS, albeit one *"not* of equal strength" as the presumption in custody and adoption cases. *Wolinski,* 115 Md.App. at 312, 693 A.2d at 43.

**10.** This is the name given by U.S. Supreme Court and other federal courts to the "tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts." *Clark v. Martinez,* 543 U.S. 371, 381–82, 125 S.Ct. 716, 724–25, 160 L.Ed.2d 734 (2005).

*In re James D.*, 295 Md. 314, 327, 455 A.2d 966, 972 (1983) (citing *Deems v. W. Md. Ry. Co.*, 247 Md. 95, 113, 231 A.2d 514, 524 (1967)); *County Comm'rs v. Meekins*, 50 Md. 28, 39–40 (1878).

 This canon is animated by the axiomatic principle that statutes carry a strong presumption of constitutionality. *Ayres v. Townsend*, 324 Md. 666, 675, 598 A.2d 470, 475 (1991); *Edgewood Nursing Home v. Maxwell*, 282 Md. 422, 427, 384 A.2d 748, 751 (1978); *Cochran v. Preston*, 108 Md. 220, 232, 70 A. 113, 115 (1908). We have said that "one attacking [the] validity [of a law passed in the exercise of police power] has the burden of affirmatively and clearly establishing its invalidity; every intendment is in favor of the validity of the statute where there is a substantial relationship between its object and the means employed to attain that object." *Aero Motors, Inc. v. Motor Vehicle Admin.*, 274 Md. 567, 589, 337 A.2d 685, 699 (1975). Thus, a party challenging the facial validity of a statute "must establish that no set of circumstances exist under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697, 707 (1987).

The Koshkos have not persuaded us sufficiently to defeat the presumption weighing in favor of the constitutionality of the Maryland GVS. The only apparent indicia to which the Koshkos point is a lack in the legislative history of the GVS of a articulated compelling governmental interest. As we explain, *infra*, the General Assembly rightfully had in mind the compelling state interest of the welfare of children by providing a means for grandparents to maintain visitation with them under certain circumstances. The Koshkos' argument that the presence of a presumption in favor of their decision on the matter of grandparental visitation is constitutionally mandated belies their facial challenge.

We shall do here as the Court of Special Appeals did: to save the statute from invalidation, we read into the GVS the parental presumption both as mandated by substantive due process and traditionally observed in Maryland common law.

Indeed, this Court, in order to bring statutes into compliance with constitutional principles, previously has applied limiting constructions to enactments that would otherwise sweep too broadly. *See, e.g., Galloway v. State,* 365 Md. 599, 627, 634, 781 A.2d 851, 867, 871 (2001) (redeeming a harassment law from a void-for-vagueness challenge by reading in a "reasonable person standard"); *Becker v. State,* 363 Md. 77, 90–92, 767 A.2d 816, 823–24 (2001) (reading a drug nuisance abatement statute providing for "equitable relief" to exclude the razing of a building without just compensation to the owner to avoid possible constitutional infirmity of the statute); *Schochet v. State,* 320 Md. 714, 725–35, 580 A.2d 176, 181–86 (1990) (interpreting the law criminalizing fellatio as inapplicable to consensual, noncommercial heterosexual activity in the privacy of the home, thereby avoiding having to pronounce whether applying the statute to such activity was constitutional); *Lucky Stores, Inc. v. Bd. of Appeals,* 270 Md. 513, 529, 312 A.2d 758, 767 (1973) (stating that the "words ['need' and 'general neighborhood' used in a zoning statute] have received a judicial gloss, sufficiently definite 'to protect the people against any arbitrary or unreasonable exercise of power' in zoning cases" to uphold the constitutionality of the statute), *discussing Neuman v. City of Baltimore,* 251 Md. 92, 246 A.2d 583 (1968); *Sanza v. Md. Bd. of Censors,* 245 Md. 319, 341, 226 A.2d 317, 329 (1967) (construing a film censorship statute, broad on its face, to apply only to "films and views to be shown for an admission charge, except when shown by public associations or institutions which do not operate for profit," so as to bring the statute within federal constitutional limits); *see also Pack Shack, Inc. v. Howard County,* 377 Md. 55, 88, 832 A.2d 170, 190 (2003) (Harrell, J., concurring in part and dissenting in part). Moreover, other states have similarly construed their grandparental visitation statutes to comply with due process and the dictates of *Troxel. See, e.g., Glidden v. Conley,* 175 Vt. 111, 820 A.2d 197, 204–05 (2003) (reading Vermont's GVS, which is very similar to that of Maryland, as carrying with it a parental presumption and requiring a finding of either parental unfitness or special circumstances or

harm to the child to overcome the presumption); *Blixt v. Blixt*, 437 Mass. 649, 774 N.E.2d 1052, 1060 (2002) (supplying parental presumption to Massachusetts GVS to preserve it from facial invalidation), *cert. denied*, 537 U.S. 1189, 123 S.Ct. 1259, 154 L.Ed.2d 1022 (2003); *McGovern v. McGovern*, 201 Ariz. 172, 33 P.3d 506, 511–12 (App.2001) (construing Arizona GVS to be consistent with due process by requiring court to apply rebuttable parental presumption).

Having construed the Maryland GVS to include the application of the parental presumption, the statute is saved from *per se* constitutional infirmity. Accordingly, we agree with the Court of Special Appeals on the question of the facial validity of Family Law § 9–102.

### 2. Parental Unfitness or Exceptional Circumstances

Petitioners also argue that the statute is unconstitutional as applied to them, again for want of due process. The Koshkos contend that the trial court and Court of Special Appeals erred by not requiring the grandparents to demonstrate that the Koshkos were unfit parents or that exceptional circumstances existed that counsel in favor of grandparental visitation before the presumption in favor of the wishes of the custodial parents is overcome. Petitioners marshal the holdings of *Troxel* and *McDermott* to support their contention that the "best interest of the child" language of § 9–102 should be infused with the unfitness/exceptional circumstances test. The Court of Special Appeals rejected this argument on a largely technical ground. Because *McDermott* was a custody case, the intermediate appellate court refused to extend *McDermott's* holding that there must be a threshold finding of parental unfitness or exceptional circumstances before proceeding to the best interests inquiry. *Koshko*, 168 Md.App. at 583–84, 897 A.2d at 882–83. The court instead cleaved to *Fairbanks*, a pre-*Troxel* grandparental visitation case which did not require such threshold findings, because *Fairbanks* was more direct precedent than, and had not been expressly overruled by, *McDermott* or other decisions of this Court. *Id.* This course of action by the Court of Special Appeals, under

the principles of *stare decisis,* was a correct one.[11] We, however, shall consider this point anew.

We begin our analysis of this due process argument mindful that visitation is a species of custody, albeit for a more limited duration. *Beckman,* 337 Md. at 703 n. 7, 655 A.2d at 908 n. 7 ("Visitation, which is considered to be a form of temporary custody, and custody determinations are generally governed by the same principles."); *Wolinski,* 115 Md.App. at 301, 693 A.2d at 38 (acknowledging the similarity of visitation and custody); *see also Gestl v. Frederick,* 133 Md.App. 216, 236, 754 A.2d 1087, 1098 (2000) (quoting *In re Thompson,* 11 S.W.3d 913, 918–19 (Tenn.Ct.App.1999)) ("To allow the courts to award visitation—a limited form of custody—to a third person would necessarily impair the parents' right to custody and control."); *see generally Taylor v. Taylor,* 306 Md. 290, 297, 508 A.2d 964, 967 (1986) ("With respect to physical custody, there is no difference between the rights and obligations of a parent having temporary custody of a child pursuant to an order of shared physical custody, and one having temporary custody pursuant to an award of visitation."); *Jackson v. Fitzgerald,* 185 A.2d 724, 726 (D.C.1962) ("The right of visitation derives from the right to custody. The court could not award the plaintiff [grandmother] visitation rights without impinging on the father's vested right of custody.").

The Court in *Fairbanks* declared that, with regard to substantive due process rights, "[v]isitation is a considerably less weighty matter than outright custody of a child, and does not demand the enhanced protections, embodied in the excep-

---

11. *Halliday v. Sturm, Ruger & Co., Inc.,* 138 Md.App. 136, 169 & n. 9, 770 A.2d 1072, 1091–92 & n. 9 (2001); *Banks v. Iron Hustler Corp.,* 59 Md.App. 408, 423, 475 A.2d 1243, 1250 (1984) ("Whatever may be our feeling about whether Maryland should continue to adhere to this rule, however, we can neither overrule nor ignore the decisions of our Court of Appeals."); *see generally Chesapeake & Curtis Bay R.R. Co. v. Richfield Oil Corp.,* 180 Md. 192, 194, 23 A.2d 677, 678–79 (construing Maryland Constitution Article 4, § 15 regarding the finality of Court of Appeals decisions), *cert. denied,* 316 U.S. 698, 62 S.Ct. 1297, 86 L.Ed. 1768 (1942).

tional circumstances test, that attend custody awards." *Fairbanks*, 330 Md. at 48, 622 A.2d at 126; *see also Wolinski*, 115 Md.App. at 305–06, 693 A.2d at 39–40. The Court of Special Appeals in the present case drew upon this language in reaching its conclusion that "the intrusions on parental rights are not comparable" as between custody and visitation. *Koshko*, 168 Md.App. at 583–84, 897 A.2d at 882. Maryland appellate courts thereafter repeated *Fairbanks's* refrain, rejecting the need to demonstrate exceptional circumstances in third party visitation cases. *Maner*, 342 Md. at 468, 677 A.2d at 563; *Beckman*, 337 Md. at 692–93, 655 A.2d at 903; *Herrick*, 154 Md.App. at 231, 838 A.2d at 1268; *Wolinski*, 115 Md.App. at 306, 693 A.2d at 40. The Court of Special Appeals in the present case also relied on the fact that the Supreme Court declined the opportunity to declare in *Troxel* "whether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation." *Koshko*, 168 Md.App. at 565, 897 A.2d at 871 (quoting *Troxel*, 530 U.S. at 73, 120 S.Ct. at 2064).

■ There is no dispute that the grant or modification of visitation involves a lesser *degree* of intrusion on the fundamental right to parent than the assignment of custody.[12] We except from this notion, however, that, because of this conceptualization, visitation somehow ranks lower on the "scale of values" such that its determination does not require the application of stringent tests as is the case with custody. *Koshko*, 168 Md.App. at 584, 897 A.2d at 882. In other words, although there may be a difference in the degree of intrusion, it is not a difference of constitutional magnitude. Visitation, like custody, intrudes upon the fundamental right of parents to direct the "care, custody, and control" of their children. Though visitation decisions granting such privileges to third

---

12. As the Court of Special Appeals noted below, the amount of time the Hainings would spend with their grandchildren outside the presence and control of the Koshkos comprised a mere "one percent of the time per calendar quarter." *Koshko*, 168 Md.App. at 584, 897 A.2d at 882.

parties may tread more lightly into the protected grove of parental rights, they tread nonetheless. As will be shown, *infra*, the weight of the footfalls on that territory is sufficiently direct and substantial as to require rigorous scrutiny.

In matters implicating state interference with a fundamental right we generally apply the strict scrutiny standard. *In re Yve S.*, 373 Md. at 569, 819 A.2d at 1041(quoting *Wolinski*, 115 Md.App. at 301, 693 A.2d at 37) (stating that, in the substantive due process context, strict scrutiny is applied when a statute affects the curtailment of fundamental rights). Despite this general principle, this Court and the Court of Special Appeals occasionally invoke dicta in *Zablocki v. Redhail*, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) [13] and language from a dissent authored by Justice O'Connor in *City of Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 462–63, 103 S.Ct. 2481, 2509–10, 76 L.Ed.2d 687 (1983), as license to reduce the level of scrutiny applied in certain cases involving state interference with fundamental liberty interests protected by due process. To be precise, there exists in precedent a principle of reserving strict scrutiny review only for cases where fundamental rights have suffered "significant interference". *Hill v. Fitzgerald*, 304 Md. 689, 701, 501 A.2d 27, 33 (1985) ("Under ... substantive due process analysis [concerning the right to access to the courts], strict scrutiny will only be invoked in those cases where laws *'significantly interfere'* with a fundamental right.") (emphasis added); *Hornbeck v. Somerset County Bd. of Educ.*, 295 Md. 597, 458 A.2d 758 (1983) ("[E]ven if education be deemed a fundamental right in Maryland, strict scrutiny would only be appropriate if a *significant deprivation* of that

---

**13.** In *Zablocki,* the U.S. Supreme Court said:

By reaffirming the fundamental character of the right to marry, we do not mean to suggest that every state regulation which relates in any way to the incidents of or prerequisites for marriage must be subjected to rigorous scrutiny. To the contrary, reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed.

434 U.S. at 386, 98 S.Ct. at 681, *quoted by Wolinski,* 115 Md.App. at 305–06, 693 A.2d at 39.

right occurs.") (emphasis added); *Wolinski,* 115 Md.App. at 303–05, 693 A.2d at 33–39; *see also Attorney General v. Waldron,* 289 Md. 683, 711, 426 A.2d 929, 944 (1981) ("The second category of statutes which activate heightened scrutiny are those which affect 'important' personal interests or work a *'significant interference* with liberty or a denial of a benefit vital to the individual.' ") (quoting LAURENCE TRIBE, AMERICAN CONSTITUTIONAL LAW 1090 (1978) (emphasis added)). Nonetheless, because we conclude that the Maryland GVS may work a "direct and substantial" interference with the Koshkos's fundamental right to parent, we apply strict scrutiny. We explain.

It appears that the decisions advancing this "significant interference" test, particularly *Wolinski,* tended to minimize the underlying principles informing the test. The Supreme Court's caveat in *Zablocki* that heightened scrutiny would not be applied to all regulation of the fundamental right to marry was qualified in a following sentence, which was not quoted in *Wolinski.* The Supreme Court stated that to obtain strict scrutiny of interference with a fundamental right, the state must "interfere directly and substantially" with that right. *Zablocki,* 434 U.S. at 387, 98 S.Ct. at 681. The *Zablocki* Court went on to elucidate this principle of "direct and substantial" interference by distinguishing its holding from another marriage impediment case, *Califano v. Jobst,* 434 U.S. 47, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977). In *Jobst,* the Court

> upheld sections of the Social Security Act providing, *inter alia,* for termination of a dependent child's benefits upon marriage to an individual not entitled to benefits under the Act. As the opinion for the Court expressly noted, the rule terminating benefits upon marriage was not 'an attempt to interfere with the individual's freedom to make a decision as important as marriage.' The Social Security provisions placed no direct legal obstacle in the path of persons desiring to get married, and ... there was no evidence that the laws significantly discouraged, let alone made 'practically impossible,' any marriages."

*Zablocki,* 434 U.S. at 387 n. 12, 98 S.Ct. at 681 n. 12 (quoting *Jobst,* 434 U.S. at 54, 98 S.Ct. at 99) (citation omitted). Because the laws at issue in *Jobst* presented neither direct nor substantial interference with the right to marry, the Court upheld the laws under rational basis review. *See Jobst,* 434 U.S. at 56, 98 S.Ct. at 100–01. The *Zablocki* Court, however, struck down as a "direct and substantial" intrusion on the right to marry, under strict scrutiny, 434 U.S. at 387–88, 98 S.Ct. at 681–82, a Wisconsin statute which prohibited a class consisting of noncustodial parents of minor children subject to a support order from marrying absent a court order, which could only be obtained upon a showing of compliance with their support obligation and also that the child would not become a public charge. 434 U.S. at 375, 98 S.Ct. at 675. In its rationale, the Court said that under the statute

> no Wisconsin resident in the affected class may marry in Wisconsin or elsewhere without a court order, and marriages contracted in violation of the statute are both void and punishable as criminal offenses. Some of those in the affected class, like appellee, will never be able to obtain the necessary court order, because they either lack the financial means to meet their support obligations or cannot prove that their children will not become public charges. These persons are absolutely prevented from getting married. Many others, able in theory to satisfy the statute's requirements, will be sufficiently burdened by having to do so that they will in effect be coerced into forgoing their right to marry. And even those who can be persuaded to meet the statute's requirements suffer a serious intrusion into their freedom of choice in an area in which w e have held such freedom to b e fundamental.

*Zablocki,* 434 U.S. at 387, 98 S.Ct. at 681.

Because the difference between the directness and substantiality of the impediments to marriage discussed in the *Jobst* and *Zablocki* opinions is critical, we should consider more closely the holdings. In *Jobst,* the challenged law eliminated a dependent child's benefits when the parent married a person ineligible for such benefits. The Court reasoned that this loss

of benefits was not a direct bar to entering matrimony, but rather an incidental consequence of it. Furthermore, whatever deterrent effect the law may have had on marriage was not substantial enough truly to dissuade couples from marrying, including the individual challenging the law. In *Zablocki*, by contrast, the assailed statute required those in the designated class wishing to marry first to seek permission from a court upon certain affirmative showings that, effectively, may have been impossible to demonstrate. Thus, this requirement placed an impermissible direct legal obstacle between the members of the class and the fundamental right to marry. The Court further noted that even for those members of the class capable of enduring the expense and tribulation of making the required showings, the requirement that they were required to do so at all was an unacceptable imposition on the right of choice with respect to marriage.

Thus, in the decision whether to apply strict scrutiny, it is the underlying notion of "direct and substantial" interference that should guide and inform courts on the notion of the "significance" of an interference. The key inquiry centers on the manner and extent to which the right is interfered with by the state. That is, in any given context, is the right subject to "direct and substantial" interference? The sentiment expressed by Maryland courts heretofore, instigated no doubt by the language in *Fairbanks*, that visitation matters deserve less scrutiny than custody matters is, upon reflection, incorrect.[14] We shall not perpetuate this notion further, particularly in the wake of the *Troxel* Court's strong affirmation of parental rights in the grandparental visitation context. For the purposes of constitutional analysis, parental autonomy is encroached upon equally by visitation matters as it is with custody disputes when the state interference is "direct and substantial".

---

14. *Koshko,* 168 Md.App. at 583–84, 897 A.2d at 882; *Wolinski,* 115 Md.App. at 306, 693 A.2d at 40. *Wolinski* further suggests that it is that the parental presumption in visitation cases is "weaker than the presumption that operates in custody and adoption disputes...." 115 Md.App. at 317, 693 A.2d at 45.

The Supreme Court's decision in the consolidated cases titled under *Lyng v. Castillo*, 477 U.S. 635, 106 S.Ct. 2727, 91 L.Ed.2d 527 (1986), illustrates this "direct and substantial" principle in another familial privacy case.[15] *Castillo* presented an equal protection challenge to an amendment of the Food Stamp Act changing the definition of "household" for benefit amount purposes so as to exclude extended family members or groups of unrelated persons living together unless those persons purchased food and prepared meals together. 477 U.S. at 636, 106 S.Ct. at 2728. The challenge was mounted by individuals who bought and prepared food as separate groups who would, as a result of the amendment to the Act, either lose entirely or experience a reduction in their food stamp benefits. *Castillo*, 477 U.S. at 637, 106 S.Ct. at 2728–29. The challengers argued that the amendment unconstitutionally infringed on familial privacy[16] by forcing the extended family members or unrelated individuals to either move apart from their confederates in order to reinstate the previous benefit levels allotted to them or to continue to live together at the

---

**15.** The concept of family privacy finds its expression in the due process right of parents to the "care, custody, and control" of their children. *In re Blessen H.*, 392 Md. 684, 693, 898 A.2d 980, 985–86 (2006); *In re Yve S.*, 373 Md. 551, 565–68, 819 A.2d 1030, 1038–40 (2003). The right to privacy relating to choices in the realm of "family life" is deeply embedded in Maryland and federal constitutional jurisprudence. In *Neville v. State* we relied on the general right to privacy in matters pertaining to the family and the home as noted in *Paris Adult Theatre I v. Slaton*. 290 Md. 364, 375, 430 A.2d 570, 575 (1981) (citing *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 65, 93 S.Ct. 2628, 2639, 37 L.Ed.2d 446, 462 (1973)). In *Department of Social Services v. Clark*, we recognized the Supreme Court precedent of *Santosky v. Kramer* for the proposition that "freedom of personal choice in matters of *family life* is a fundamental liberty interest protected by the Fourteenth Amendment." 296 Md. 190, 196, 461 A.2d 1077, 1080 (1983) (citing *Santosky*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599, 606 (1982)) (emphasis added) (citations omitted).

**16.** The Court characterized the specific right implicated in *Lyng v. Castillo* as the liberty interest in setting "family living arrangements". 477 U.S. 635, 637, 106 S.Ct. 2727, 2728–29, 91 L.Ed.2d 527 (1986). The Court of Special Appeals refers to this right as the " 'family life' liberty interest". *L.F.M. v. Dep't of Social Servs.*, 67 Md.App. 379, 386, 507 A.2d 1151, 1154 (1986).

sufferance of diminished or terminated benefits. *Id.* The Supreme Court upheld the amendment under rational basis review. *Castillo,* 477 U.S. at 639, 106 S.Ct. at 2730. In support of its decision not to apply strict scrutiny, the Court applied *Zablocki* because the amendment did not impose "direct and substantial interference" with the families' privacy rights. *Castillo,* 477 U.S. at 638, 106 S.Ct. at 2729. The Court explained:

> The "household" definition does not order or prevent any group of persons from dining together. Indeed, in the overwhelming majority of cases it probably has no effect at all. It is exceedingly unlikely that close relatives would choose to live apart simply to increase their allotment of food stamps, for the cost of separate housing would almost certainly exceed the incremental value of the additional stamps.

*Castillo,* 477 U.S. at 638, 106 S.Ct. at 2729. The amendment simply presented a choice of options to families, attached to which were divergent consequences; it mandated nothing. Any adverse consequences embodied by the decrease or termination of food stamps was attributable to the choices of the families and was, thus, incidental and indirect in nature. Further, in the likely event that the amendment did not deter the families from living together, the financial detriment accompanying the choice would be eclipsed by the cost of maintaining two or more separate residences. The Food Stamp Act amendment in *Castillo* and the statute terminating dependent children's benefits in *Jobst* share a critical commonality: they both affected indirect impositions on fundamental rights and, accordingly, were not subject to strict scrutiny.[17]

---

17. A similar case arose in the term following the *Castillo* decision dealing with a Deficit Reduction Act provision that changed welfare rules to require single mothers to include in their family unit for benefit allotment purposes children for whom support payments were being made. *Bowen v. Gilliard,* 483 U.S. 587, 589–90, 107 S.Ct. 3008, 3011, 97 L.Ed.2d 485 (1987). Litigants challenged the constitutionality of the change, which reduced the family unit's benefit amount if the child subject to the support award stayed in the household, thus interfering with family privacy. The Supreme Court upheld the provision under

We are unwilling to say the same about the Maryland GVS called into question before us in the present case.

The Maryland GVS has an unmistakable and intended direct effect on the fundamental right to parent. Family Law § 9–102 authorizes grandparents to institute, and courts to resolve, challenges to parents' decisions concerning to whom their children will be exposed and for what duration by way of visitation. Although the statute does not bar absolutely parents from exercising their rights, as did the law struck down in *Zablocki,* the GVS does more than set out dispassionately the consequences of one parental decision or another. Rather, the statute permits grandparents seeking the initiation or increase of visitation with their grandchildren to intercede directly in parental determinations of their children's best interests. Instead of merely creating a consequence of the parents' exercise of their right to control their child, the statute exposes the very parental decision-making process relating to the exercise of that right to the challenge of disgruntled grandparents. As in *Zablocki,* only a favorable court order finally resolves such a dispute and affirms the validity of the Koshkos' exercise of their fundamental right.

This direct interference is also substantial in nature. Although, as we previously acknowledged in this opinion, the degree of intrusion upon parental rights created by visitation matters is less than that of custody matters, the intrusion perpetrated may be sufficiently substantial to offend due process. The cost of two and one-half years of litigation; the

---

rational basis review after stating that just because "some families may decide to modify their living arrangements in order to avoid the effect of the amendment, does not transform the amendment into an act whose design and direct effect are to 'intrud[e] on choices concerning family living arrangements.' " *Bowen,* 483 U.S. at 601–02, 107 S.Ct. at 3017–18. In a footnote, the *Bowen* Court defended the legislation's "indirect effect" of inspiring some families to live apart by noting that many welfare provisions may have "unintended consequences" that do not call into question their constitutionality. 483 U.S. at 602, 107 S.Ct. at 3017. The challenges to parental autonomy created by the Maryland GVS are not unintended. To the contrary, the law's only logical purpose is to offer grandparents the opportunity to dispute a parent's decision regarding visitation.

forced interaction between the feuding Koshkos and Hainings through the vehicle of court-ordered counseling; the compromise of the Koshkos' parental autonomy; and the time, however short, that the children will be outside of the "care, custody, and control" of the Koshkos are disruptions imposed by the Circuit Court's visitation order. *Maner,* 342 Md. at 470, 677 A.2d at 564 ("[W]e have recognized that judicial supervision of familial relationships is disruptive to the lives of children.") (citing *In re Adoption No. 10941,* 335 Md. 99, 120, 642 A.2d 201, 212 (1994)); *Fairbanks,* 330 Md. at 50, 622 A.2d at 127 ("The trial court should also be alert to the psychological toll the visitation dispute itself might exact on a child in the midst of contesting adults.").

Having determined that the GVS imposes a direct and substantial interference upon the Koshkos' exercise of their parental rights with respect to the visitation with their children by the Hainings, we are bound to apply strict judicial scrutiny. Under strict scrutiny, a statute may be validated only if it is deemed to be suitably, or narrowly, tailored to further a compelling state interest. *Ehrlich v. Perez,* 394 Md. 691, 717, 908 A.2d 1220, 1244 (2006); *Montrose Christian Sch. Corp. v. Walsh,* 363 Md. 565, 586, 770 A.2d 111, 123 (2001); *Murphy v. Edmonds,* 325 Md. 342, 356, 601 A.2d 102, 109 (1992); *Broadwater v. State,* 306 Md. 597, 603, 510 A.2d 583, 585 (1986). There can be no legitimate debate as to the sufficiency of the State's compelling interests here, chief of which is the overarching role as *parens patriae* to ensure the well-being of Maryland's children. *See Shurupoff,* 372 Md. at 657–58, 814 A.2d at 554. The GVS provides a means for grandparents to play a vital role in the development and happiness of a child's life when circumstances are such that court action is warranted and needed to enforce that role properly. *See McDermott,* 385 Md. at 430, 869 A.2d at 816 ("Grandparents' contributions do not go unnoticed and their efforts likely accrue to the benefit of the grandchildren."); *Frase v. Barnhart,* 379 Md. 100, 122–23, 840 A.2d 114, 127 (2003) ("In the plurality Opinion joined by three other members of the Court, Justice O'Connor acknowledged the impor-

tant role that grandparents and other third parties often play in children's lives . . . .") (citing *Troxel,* 530 U.S. at 64, 120 S.Ct. at 2059, 147 L.Ed.2d at 56); *see also Wolinski,* 115 Md.App. at 317, 693 A.2d at 45 (discussing "the State's interest in fostering beneficial grandparent-grandchild relationships."). The State's interest in encouraging the salutary contributions grandparents make to the lives of their grandchildren is clearly a compelling one. There is, however, reason to doubt the narrow tailoring of the statute to vindicate the State's interest.

As we have already discussed, the GVS permits a direct and substantial burden on the exercise of parental rights concerning the control of their children. The chief safeguard in place to protect parental rights in a grandparental visitation dispute is the presumption favoring a parental decision, which first must be rebutted before any inquiry into the child's best interests. The parental presumption we engrafted onto the GVS saves it from *per se* invalidation under *Troxel,* but it is not sufficient, by itself, to preserve the constitutionality of the statute. Although the presumption elevates a Maryland court's decision above the "simple disagreement between the [trial court] and the [parents] concerning [their] children's best interests," disparaged by the Supreme Court in *Troxel,* 530 U.S. at 72, 120 S.Ct. at 2063, it does not do enough to protect parents from undue interference with their rights. Fit parents, who are presumed to act in their children's best interests, *McDermott,* 385 Md. at 422, 869 A.2d at 811 (citing *Parham,* 442 U.S. at 602, 99 S.Ct. at 2504), nonetheless may be hailed into court to defend their decisions absent any showing that they are unfit and without any requirement that the grandparents challenging the parental decision plead any exceptional circumstances that may tend to override the parental presumption. A proceeding that may result in a court mandating that a parent's children spend time with a third party, outside of the parent's supervision and against the parent's wishes, no matter how temporary or modifiable, necessitates stronger protections of the parental right. The importance of parental autonomy is too great and our reluc-

tance to interfere with the private matters of the family too foreboding,[18] whether it be in matters of custody or visitation, to allow parental decision-making to remain that vulnerable to frustration by third parties.

As we noted in *McDermott*, "the constitutional right is the ultimate determinative factor" in third party custody cases where parents are fit and no extraordinary circumstances are present. *McDermott*, 385 Md. at 418, 869 A.2d at 808. Thus, if third parties wish to disturb the judgment of a parent, those third parties must come before our courts possessed of at least *prima facie* evidence that the parents are either unfit or that there are exceptional circumstances warranting the relief sought before the best interests standard is engaged. This scheme, applied to the visitation context, would supply the safeguards lacking to tailor suitably the GVS to the State's interests by ensuring that parental decisions entitled to deference are not unduly placed in jeopardy by less significant familial disputes. The *Fairbanks* Court, in refusing to impose an unfitness/exceptional circumstances test, relied solely upon the lack of any statutory or legislative express direction to do so. 330 Md. at 47–48, 622 A.2d at 125–26. In a post-*Troxel* world, however, we must revisit this analysis where the Constitution requires greater protection of the interests involved.

The facial provisions of the GVS require merely a "non-constitutional" best interests of the child inquiry. *Id.* We already have shown that this standard, which is the proper crucible for resolving disputes between fit parents, is inadequate, by itself, to protect the vital liberty interests implicated in disputes between fit parents and third parties over the upbringing of children. *McDermott*, 385 Md. at 353–54, 869 A.2d at 770 ("Where the dispute is between a fit parent and a

---

18. *See Troxel*, 530 U.S. at 68–69, 120 S.Ct. at 2061 ("[S]o long as a parent adequately cares for his or her children *(i.e.* is fit), there will normally be no reason for the state to inject itself into the private realm of the family to further question the ability of that parents to make the best decisions concerning the rearing of that parent's children."); *see also Maner*, 342 Md. at 470, 677 A.2d at 564; *Fairbanks*, 330 Md. at 50, 622 A.2d at 127.

private third party, however, both parties do not begin on equal footing in respect to 'care, custody, and control' of the children.... The arguments and outcome of the instant case [requiring a finding of parental unfitness or exceptional circumstances before the child's best interests standard is employed] in no way alter the 'best interests of the child' standard that governs courts' assessments of disputes *between fit parents* involving visitation or custody."). To preserve fundamental parental liberty interests, we now apply a gloss to the Maryland GVS requiring a threshold showing of either parental unfitness or exceptional circumstances indicating that the lack of grandparental visitation has a significant deleterious effect upon the children who are the subject of the petition.[19] We do so under the principle of constitutional

---

**19.** Other courts have construed their GVS provisions similarly. *See, e.g., Richburg v. Richburg,* 895 So.2d 311, 318 (Ala.Civ.App.2004) (requiring that grandparents show by "clear and convincing evidence that the child would be substantially harmed by the father's decision to deny them set visitation"); *Moriarty v. Bradt,* 177 N.J. 84, 827 A.2d 203, 223 (2003) (holding that for the New Jersey GVS to be narrowly tailored to the state's compelling *parens patriae* interest in the well-being of children, courts must impose a burden on grandparents "establishing by a preponderance of the evidence that visitation is necessary to avoid harm to the child"), *cert. denied,* 540 U.S. 1177, 124 S.Ct. 1408, 158 L.Ed.2d 78 (2004); *Glidden v. Conley,* 175 Vt. 111, 820 A.2d 197, 204–05 (2003) (requiring a finding of either parental unfitness or special circumstances or harm to the child to overcome the parental presumption); *Camburn v. Smith,* 355 S.C. 574, 579–80, 586 S.E.2d 565, 567–68 (2003) ("In sum, parents and grandparents are not on an equal footing in a contest over visitation. Before visitation may be awarded over a parent's objection, one of two evidentiary hurdles must be met: the parent must be shown to be unfit by clear and convincing evidence, or there must be evidence of compelling circumstances to overcome the presumption that the parental decision is in the child's best interest."); *In re Pensom,* 126 S.W.3d 251, 256 (Tex.App.2003) ("[W]e hold that in order to satisfy the 'best interest of the child' prong of the Grandparent Access Statute, a grandparent must overcome the presumption that a fit parent acts in the best interest of his or her child. To overcome this presumption, a grandparent has the burden to prove, by a preponderance of the evidence, either that the parent is not fit, or that denial of access by the grandparent would significantly impair the child's physical health or emotional well-being.") (footnote omitted); *Roth v. Weston,* 259 Conn. 202, 789 A.2d 431, 445 (2002) (finding that "an allegation, along with proof thereof, that the parent's decision regarding visitation will cause the child to suffer real and substantial emotion-

avoidance previously invoked in this opinion to engraft onto the GVS a parental presumption. *In re James D.,* 295 Md. at 327, 455 A.2d at 972 (citing *Deems,* 247 Md. at 113, 231 A.2d at 524); *Meekins,* 50 Md. at 39–40 (1878); ·*see also Clark,* 543 U.S. at 382, 125 S.Ct. at 725.

Our adoption of the parental unfitness or exceptional circumstances test borrowed from the realm of custody cases should not provoke much upset in the way these types of proceedings unfold.[20] This is owing, in part, to the reality that the standards and processes relevant to all manner of custody and visitation determinations are nearly identical. In *Boswell* we recognized the homogeneity between custody and visitation when we noted that "the case law discussed in this opinion

---

al harm likewise presents a compelling state interest that will permit interference with parental rights, provided the petitioner has established a parent-like relationship with the child"); *Blixt v. Blixt,* 437 Mass. 649, 774 N.E.2d 1052, 1060 (2002) (holding that "the grandparents must allege and prove that the failure to grant visitation will cause the child significant harm by adversely affecting the child's health, safety, or welfare"), *cert. denied,* 537 U.S. 1189, 123 S.Ct. 1259, 154 L.Ed.2d 1022 (2003); *In re Application of Herbst,* 971 P.2d 395, 399 (Okla.1998) ("To reach the issue of a child's best interests, there must be a requisite showing of harm, or threat of harm....."); *Williams v. Williams,* 256 Va. 19, 501 S.E.2d 417, 418 (1998) (" '[B]efore visitation can be ordered over the objection of the child's parents,˙a court must find an actual harm to the child's health or welfare without such visitation. A court reaches consideration of the 'best interests' standard in determining visitation only after it finds harm if visitation is not ordered.' ") (quotations omitted); *Brooks v. Parkerson,* 265 Ga. 189, 454 S.E.2d 769, 773 n. 5 ("[T]he 'best interest of the child' standard does not come into play to permit interference with the custody and control of the child, over parental objection, unless and until there is a showing of *harm* to the child without that interference."), *cert. denied,* 516 U.S. 942, 116 S.Ct. 377, 133 L.Ed.2d 301 (1995); *Litz v. Bennum,* 111 Nev. 35, 888 P.2d 438, 440 (1995) ("We conclude that the parental preference policy is a rebuttable presumption that must be overcome either by a showing that the parent is unfit or other extraordinary circumstances."); *Hawk v. Hawk,* 855 S.W.2d 573, 580 (Tenn.1993) (requiring "an initial showing of harm ... before the state may intervene to determine the 'best interests of the child' ").

**20.** Ours is not the first state high court to import the unfitness ·or exceptional circumstances test into the third party visitation realm from third party custody jurisprudence. *See, e.g., Moriarty,* 827 A.2d at 220–22.

concerning custody determinations, and the principles governing such situations, are equally applicable to visitation proceedings." 352 Md. at 236, 721 A.2d at 677. Thus, it was *comme il faut* (fitting or proper) for us to state that the best interest of the child standard is applied in the discretion of the trial judge as the principal consideration in both custody and visitation proceedings. *Boswell,* 352 Md. at 219, 721 A.2d at 669. This common application of standards has not been confined to the initial assignment of custody or visitation, but also has extended to the modification of both. The Court of Special Appeals indicated as much in *McMahon v. Piazze,* where the court noted that the "material change in circumstances" standard is applied in actions seeking the modification of both custody and visitation. 162 Md.App. 588, 596, 875 A.2d 807, 812 (2005). Further, identical tests are applied in instances where a change is sought in either custody or visitation due to an apprehension of potential or actual harm to the child. *Boswell,* 352 Md. at 225, 721 A.2d at 672 (indicating that the best interests of the child standard is applied concurrently with an adverse impact test, whereby a change is granted only upon a showing of actual emotional or physical harm to the child). Now that we conclusively [21] have stated in *McDermott* that parental unfitness and exceptional circumstances shall be threshold considerations in third party custody determinations, it is appropriate that we now also apply those considerations in third party visitation disputes.

We are aware that the plurality opinion in *Troxel* does not compel our holding in this regard in the present case. 530 U.S. at 73, 120 S.Ct. at 2064. The result reached here illustrates the notion that the extent of protection bestowed

---

21. We say "conclusively" because, as the Court in *McDermott v. Dougherty,* 385 Md. 320, 418–19, 869 A.2d 751, 808–09 (2005) noted, the threshold parental unfitness or exceptional circumstances test was the prevailing standard in Maryland third party custody cases (along with a majority of states) prior to *Shurupoff v. Vockroth,* 372 Md. 639, 814 A.2d 543 (2003). As the Court then put it, the *McDermott* decision "adopt[ed] for Maryland, if we [had] not already done so, the majority position." 385 Md. at 418–19, 869 A.2d at 808–09.

upon liberty interests recognized as being enshrined within the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution does not dictate necessarily the full compliment of safeguards extended to liberty interests available under the Maryland due process analog found in Article 24 of the Maryland Declaration of Rights.[22]

For the foregoing reasons, we reverse the Court of Special Appeals in accordance with our holding that there must be a

---

22. Our precedent states clearly that the Maryland and Federal due process provisions have been read *"in pari materia"*. *Pickett v. Sears, Roebuck & Co.*, 365 Md. 67, 77, 775 A.2d 1218, 1224 (2001); *Pitsenberger v. Pitsenberger*, 287 Md. 20, 27, 410 A.2d 1052, 1056 (1980); *Allied Am. Mut. Fire Ins. Co. v. Comm'r of Motor Vehicles*, 219 Md. 607, 615–16, 150 A.2d 421, 426–27 (1959). This principle of reading the provisions in a like manner does not, however, reduce our analysis to a mere echo of the prevailing Fourteenth Amendment jurisprudence. *Aero Motors, Inc. v. Motor Vehicle Admin.*, 274 Md. 567, 587, 337 A.2d 685, 699 (1975) ("Although Art. [24] of the Maryland Declaration of Rights has long 'been equated' with the 'due process' clause of the Fourteenth Amendment by judicial construction and application, the two provisions are not synonymous."); *see also* William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L.Rev. 489, 491 (1977) ("[S]tate courts cannot rest when they have afforded their citizens the full protections of the federal Constitution. State constitutions, too, are a font of individual liberties, their protections often extending beyond those required by the Supreme Court's interpretation of federal law. The legal revolution which has brought federal law to the fore must not be allowed to inhibit the independent protective force of state law—for without it, the full realization of our liberties cannot be guaranteed."). We have not hesitated, where deemed appropriate, to offer a different interpretation of the Maryland provision. For examples, see *Dua v. Comcast Cable of Maryland, Incorporated*, 370 Md. 604, 621, 805 A.2d 1061, 1071 (2002) (cataloguing cases). *See also Borchardt v. State*, 367 Md. 91, 175, 786 A.2d 631, 681 (2001) (Raker, J., dissenting) ("Although this Court has generally interpreted Article 24 *in pari materia* with the Due Process Clause of the Fourteenth Amendment, we have interpreted it more broadly in instances where fundamental fairness demanded that we do so."). Judge Raker's dissent in *Borchardt* cited some examples in the criminal context, such as placing stricter limits on prosecutorial discretion to enter *nolle prosequi* and the optional merger of criminal offenses. *Id.* We have also read Maryland's due process clause more broadly than the federal constitution in granting the right to counsel, *see Rutherford v. Rutherford*, 296 Md. 347, 358, 363, 464 A.2d 228, 234, 237 (1983), *cited in Das v. Das*, 133 Md.App. 1, 28, 754 A.2d 441, 456 (2000), and the protection from self-incrimination, *Choi v. State*, 316 Md. 529, 535 n. 3, 560 A.2d 1108, 1111 n. 3 (1989).

finding of either parental unfitness or exceptional circumstances demonstrating the current or future detriment to the child, absent visitation from his or her grandparents, as a prerequisite to application of the best interests analysis. Accordingly, we overrule the portions of *Fairbanks, Maner, Beckman, Herrick,* and *Wolinski* that are inconsistent with this holding.

Because we have decided that the GVS was unconstitutionally applied to the Koshkos in the absence of a threshold finding of parental unfitness or exceptional circumstances, this case must be remanded to the Circuit Court for further proceedings consistent with our opinion. Although this may have the unfortunate consequence of extending the course of this litigation, it would be unfair for us to assess whether the current record could meet the newly announced threshold requirement of parental unfitness or exceptional circumstances, as the Hainings had no reason to believe that they were required to plead or adduce any evidence in this regard. Moreover, the trial court could not have foreseen reasonably that such a requirement would be declared by the Court.[23]

---

**23.** In affected cases pending at the time this opinion is filed, where appropriate, courts may allow amendments to pleadings or the presentation of additional evidence in light of the holdings announced here. In cases filed after this opinion, the petitioners, in order to avert or overcome a motion to dismiss their petition, must allege a sufficient factual predicate in the petition so as to present a *prima facie* case of unfitness or exceptional circumstances, as well as invoking the best interest standard. *See Patton v. United States of America Rugby Football Union,* 381 Md. 627, 635, 851 A.2d 566, 570 (2004) (quoting *Valentine v. On Target, Inc.,* 353 Md. 544, 548–49, 727 A.2d 947, 949 (1999) ("The granting of a motion to dismiss is proper when, even if the facts and allegations as set forth in the complaint were proven to be true, the complaint would nevertheless fail to state a claim upon which relief could be granted.") (citations omitted)).

At any evidentiary hearing on a petition, the petitioners must produce evidence to establish their *prima facie* case on the issue of either parental unfitness or exceptional circumstances as well as evidence sufficient to tip the scales of the best interests balancing test in their favor. We appreciate that there may be circumstances where evidence proffered for the satisfaction of a threshold element also may have relevance in the determination of the best interest standard. We do not intend to foster a "trial within a trial." At the end of the day,

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.

ELDRIDGE, J., Dissents.

ELDRIDGE, J., dissenting:

While I agree with the Court that Maryland Code (1984, 2006 Repl.Vol.), § 9–102, is not facially unconstitutional, I disagree with the remainder of the Court's opinion. While the opinion states that the Court is not principally relying on *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), the Court actually places a great deal of reliance on Justice O'Connor's opinion in *Troxel.* That opinion, however, was not an opinion of the Supreme Court and does not appear to reflect the views of a majority of the Supreme Court. *Troxel* is certainly not a sufficient basis for overruling several prior opinions by this Court.

*McDermott v. Dougherty*, 385 Md. 320, 869 A.2d 751 (2005), on which the majority also relies, was not a visitation case, did not involve § 9–102 of the Family Law Article, and is quite distinguishable. Moreover, if I had sat in the *McDermott* case, I would have joined Judge Wilner's concurring opinion.

---

petitioners, in order to be successful, must shoulder the burdens to adduce at least a *prima facie* case on both the unfitness/exceptional circumstances standard and the best interests standard.